AO 91 (REV.5/85) Criminal Complaint

AUSA David Weisman (312) 353-4119
AUSA April M. Perry  (312) 886-5966

**MAGISTRATE JUDGE MASON**

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**FILED**

v.

RAPHAEL MANUEL, aka N

JERMAINE BELL

DEC 1 2008

DEC 1 2008

MICHAEL W. DOBBINS

CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER **08 CR 980**

Under Seal

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.

On approximately September 14, 2007, in __Cook__ County and elsewhere, in the __Northern__ District of __Illinois__, and elsewhere,

defendants did,

knowingly and intentionally conspire with each other and with Ayhetoro Taylor and others to possess with intent to distribute controlled substances, namely, in excess of 5 kilograms of cocaine and 1 kilogram of heroin, in violation of Title 21, United States Code, Section 841(a)(1),

all in violation of Title __21__ United States Code, Section __846__, and Title __18__, United States Code, Section __2__.

I further state that I am a __Special Agent, FBI__ and that this complaint is based on the following facts:

See Attached Affidavit.

Continued on the attached sheet and made a part hereof: __X__ Yes __ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

December 1, 2008                    at    Chicago, Illinois
Date                                         City and State

Magistrate Judge Michael T. Mason
Name & Title of Judicial Officer

Signature of Judicial Officer

**FILED**

DEC 0 1 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

STATE OF ILLINOIS      )
                       )      SS
COUNTY OF COOK         )

## AFFIDAVIT

I, James P. Roache, Special Agent, Federal Bureau of Investigation, being duly sworn,

state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been

so employed for sixteen years.  As a Special Agent with the FBI, my duties and responsibilities have

included conducting criminal investigations involving various federal criminal statutes.  In my

current duties, I primarily investigate public corruption matters, including police corruption.  I also

have had experience in conducting narcotics investigations.

## BASIS OF INFORMATION

2.      The information contained in this affidavit is based on my work with an Undercover

Agent of the FBI, review of various forms of electronic surveillance (including consensually

recorded conversations), physical surveillance, review of investigative reports, and my conversations

with other experienced Agents and law enforcement officers involved in this investigation.  Because

this affidavit is being submitted for the limited purpose of establishing probable cause that the below

named subjects conspired to possess with the intent to distribute a controlled substance, I have not

include all facts and information of which I am aware regarding this investigation.

## BACKGROUND AND OVERVIEW OF THE INVESTIGATION

3.      Over the last several years, the FBI has received information from numerous sources

that corrupt law enforcement officers were employed with various law enforcement agencies in

southern Cook County, including the Harvey Police Department. This information included allegations regarding law enforcement officers engaging in illegal activities, including robbery, extortion, narcotics offenses, and weapons distribution. Sources for this information included cooperating witnesses, confidential informants, proffers of various defendants, and, in some cases, other law enforcement officers.

4.      Based in part on this information, the FBI inserted a Special Agent of the FBI acting in an undercover capacity (hereinafter referred to as "UCA-1") into a local business (hereinafter referred to as "BUSINESS-1") inside the city of Harvey, Illinois. UCA-1 was instructed, in part, to identify corrupt law enforcement officers.

5.      Beginning in early 2007, UCA-1, while working at BUSINESS-1, met several law enforcement officers. UCA-1 made known to these officers that he/she participated in criminal activities. Initially, UCA-1 discussed criminal activity such as gambling and transporting large amounts of money. UCA-1 also discussed, and, as detailed below, actually purchased, controlled substances from law enforcement officers. UCA-1 also purported himself/herself to be a broker of drug transactions. Specifically, UCA-1 represented himself/herself as a broker of large scale drug transactions, during which UCA-1 would coordinate the transfer of multi-kilogram quantities of cocaine and heroin between sources of these drugs and UCA-1's purported customers. In fact, both the purported sources and the purported customers were also agents of the FBI acting in undercover capacities.

6.      In his/her role of a drug broker, UCA-1 recruited various law enforcement officers who served as "security" for these purported drug transactions. Before the transactions, UCA-1 would advise the officers that the transaction for which they were providing protection was a transfer

of controlled substances. Often, UCA-1 would provide the exact amount and the nature of the controlled substance (usually purported cocaine or heroin). Following the transactions, UCA-1 would pay each officer a fee for his services, ranging from approximately $400 to approximately $4,000 in United States Currency.

7.     During the course of this undercover operation, UCA-1 identified two individuals, AHYETORO TAYLOR, and RAPHAEL MANUEL, who would serve as recruiters of other law enforcement officers to work as security for purported drug transactions. Specifically, on several occasions UCA-1 contacted TAYLOR and/or MANUEL and asked for a specified number of other officers to serve as security for these purported drug transactions. UCA-1 then met with TAYLOR and/or MANUEL and the other recruited officers to explain the upcoming transactions. As noted above, and as described in more detail below, during these meetings, UCA-1 explicitly discussed the type and quantity of drugs that were allegedly being transferred.

## CONDUCT OF CHARGED LAW ENFORCEMENT OFFICERS

8.     Below I have summarized the roles of each defendant and have referenced each transaction in which the defendants participated:

a.     AYHETORO TAYLOR, aka "Red:" TAYLOR is employed as a Cook County Sheriff's Office Correctional Officer. TAYLOR recruited other individuals to participate in purported drug operations arranged by UCA-1. TAYLOR also participated in a sale of cocaine to UCA-1. TAYLOR participated in purported narcotics transactions on August 1, 2007; August 22, 2007; September 14, 2007; October 24, 2007; November 16, 2007; November 30, 2007; December 10, 2007; December 17, 2007; and May 13, 2008. TAYLOR also participated in a sale of cocaine to UCA-1 on April 18, 2008.

b.       RAPHAEL MANUEL, aka "Raph," and "Ray:" MANUEL is employed as a Cook County Sheriff's Correctional Officer. MANUEL recruited other individuals to participate in purported drug operations arranged by UCA-1, and twice sold ounce quantities of cocaine to UCA-1. MANUEL participated in purported narcotics transactions on: August 22, 2007; September 14, 2007; October 24, 2007; November 16, 2007; November 30, 2007; December 10, 2007; December 17, 2007; and May 13, 2008. MANUEL also participated in a sale of cocaine to UCA-1 on December 5, 2007 and April 18, 2008.

c.       DWAYNE WILLIAMS: WILLIAMS is employed as a Harvey Police Officer. WILLIAMS participated in purported narcotics transactions on August 29, 2007 and February 29, 2008. WILLIAMS also participated in an attempted narcotics transaction on January 17, 2008.

d.       ANTOINE DUDLEY: DUDLEY is employed as a Harvey Police Officer. DUDLEY participated in purported narcotics transactions on August 29, 2007 and February 29, 2008. DUDLEY also participated in an attempted narcotics transaction on January 17, 2008.

e.       JERMAINE BELL: JERMAINE BELL is employed by Cook County Sheriff's Office as a correctional officer. BELL participated in a purported narcotics transaction on September 14, 2007.

f.       KYLE WILSON: KYLE WILSON is employed as a Chicago Police Officer. WILSON participated in a purported narcotics transaction on October 24, 2007.

g.       TIMOTHY FUNCHES, JR.: TIMOTHY FUNCHES, JR. is employed by Cook County Sheriff's Office as a correctional officer. FUNCHES participated in a purported narcotics transaction on November 16, 2007.

h.     DIALLO S. MINGO: DIALLO S. MINGO is employed by Cook County Sheriff's Office as a correctional officer. MINGO participated in a purported narcotics transaction on November 16, 2007.

i.     ANTWON FUNCHES: ANTWON FUNCHES is employed by Cook County Sheriff's Office as a Deputy Sheriff II. FUNCHES participated in a purported narcotics transaction on November 30, 2007.

j.     ANTONIO McCASKILL: ANTONIO McCASKILL claims to be employed as a law enforcement officer. Based upon our investigation to date, I have not been able to confirm that he is a sworn law enforcement officer. McCASKILL participated in a purported narcotics transaction on November 30, 2007.

k.     DANIEL LEE: DANIEL LEE is employed by Cook County Sheriff's Office as a Deputy Sheriff II. LEE participated in a purported narcotics transaction on December 10, 2007.

l.     JULIUS SCOTT: JULIUS SCOTT is employed by Cook County Sheriff's Office as a Deputy Sheriff II. SCOTT participated in a purported narcotics transaction on December 10, 2007.

m.     RICHARD O. HALL, JR.: RICHARD O. HALL, JR. is employed by Cook County Sheriff's Office as a correctional officer. HALL participated in a purported narcotics transaction on December 17, 2007.

n.     ROBERT KELLY: ROBERT KELLY is employed by Cook County Sheriff's Office as a correctional officer. KELLY participated in a purported narcotics transaction on December 17, 2007.

o.    JAMES E. ENGRAM: JAMES E. ENGRAM is a Harvey Police Officer. ENGRAM participated in an attempted narcotics transaction on January 17, 2008, and a purported narcotics transaction on February 29, 2008.

p.    TAVIS RAMSEY: RAMSEY represented that he was employed as a law enforcement officer. Based upon our investigation to date, I do not believe that he is a sworn law enforcement officer. RAMSEY participated in purported narcotics transactions on: August 22, 2007; September 14, 2007; and, October 24, 2007.

### PRELIMINARY CONVERSATIONS WITH AYHETORO TAYLOR and RAPHAEL MANUEL REGARDING THEIR WILLINGNESS TO SERVE AS SECURITY FOR BROKERED NARCOTICS TRANSACTIONS

9.    On or about July 23, 2007, UCA-1 had a recorded telephone conversation with AYHETORO TAYLOR, a.k.a. "Red," a Cook County Sheriff's Office Correctional Officer. TAYLOR and UCA-1 had previously met at BUSINESS-1 where TAYLOR was a patron. UCA-1 asked TAYLOR if TAYLOR could assist in future "side jobs," and if he (TAYLOR) could be armed during his "side jobs."[1] TAYLOR agreed to talk further with UCA-1 about future "side jobs," and mentioned that he could be armed.

10.    On or about July 23, 2007, UCA-1 had a recorded telephone conversation with RAPHAEL MANUEL, a.k.a. "Ray," and "Raph," a Cook County Sheriff's Office Correctional

---

[1]    This conversation and all other ensuing conversations involving UCA-1 discussed in this affidavit are recorded unless noted otherwise. I, or other agents of the FBI, have reviewed all of the recordings of conversations referenced in this affidavit. To the extent exact quotations have been included in this affidavit, these quotations are based upon preliminary reviews of the recordings, but are considered drafts, and may be later clarified after further investigation. I have included in bracketed language, and elsewhere, my understanding of the meanings of these conversations, which understanding is based upon my training and experience. Additionally, the identities of the speakers is based upon a number of investigative techniques, including UCA-1's observations, physical surveillance, and various forms of electronic surveillance.

Officer, and a friend of TAYLOR'S. MANUEL and UCA-1 met at BUSINESS-1 where MANUEL was a patron. UCA-1 asked MANUEL if he (MANUEL) could assist in future "side jobs," and if MANUEL could be armed during such "side jobs." MANUEL agreed to talk further with UCA-1 about future side jobs, and stated that he could be armed.

11.     On or about July 29, 2007, UCA-1 met TAYLOR at BUSINESS-1. During the meeting, UCA-1 informed TAYLOR, "I've been brokering[2] some things, and like if any of this makes you uncomfortable, you just say the word and it stops. On occasion, I hire some security, alright?" UCA-1 continued, "It's small quantities of sometimes cocaine, sometimes weed." UCA-1 stated, "I broker it and then if something goes down, if something's happening, you know, use your expertise. If somebody's getting robbed or whatever. You know what I mean?" TAYLOR responded, "right, right, okay." UCA-1 said, "Like I said, if any of this makes you uncomfortable, just no, no problem. You won't hurt my feelings." TAYLOR responded, "It's cool." UCA-1 said, "I'm coming to you in confidence, ya know, it'd be great if you didn't mention it to anybody, man." TAYLOR responded, "Oh no. Nobody business is business." UCA-1 said, "Exactly, you know it's gonna be on uh, case by case thing. Ya know, hey, Red ["Red" is an alias of TAYLOR's], I, I need, your help tomorrow or whatever. Are you working or whatever." TAYLOR stated, "Yeah." TAYLOR later in the meeting stated, "That sounds good. I'm in. I don't know about Ray ["Ray" is an alias of MANUEL's], but I'm in. I'm definitely in. If I ever feel like it is getting too much, I'll

---

[2]     The term "brokering" is commonly used by individuals involved in drug trafficking. A "broker" typically coordinates drug transactions, on behalf of another individual, for example, a drug supplier. On some occasions, the "broker" will make arrangements with the drug supplier and drug purchaser, ensuring that the drug and currency transfer occur without any interference. Law enforcement officers commonly understand that the terminology "broker" refers to narcotics transactions.

just let you know. But right now I'm in." UCA-1 asked, "You can carry, right [carry a firearm]?" TAYLOR said, "Yeah." UCA-1 asked, "off duty?" TAYLOR responded, "twenty four seven." TAYLOR then proceeded to inform UCA-1 that he could carry a firearm in all fifty states, "carry everywhere."

## AUGUST 1, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR

12.     Following the above conversation with TAYLOR, on or about July 30, 2007, UCA-1 had a subsequent recorded telephone conversation with TAYLOR. UCA-1 asked TAYLOR to assist with "something going down tomorrow." TAYLOR agreed to assist UCA-1.

13.     On or about August 1, 2007, UCA-1 had a recorded telephone conversation with TAYLOR, in which TAYLOR confirmed his availability. During this conversation, UCA-1 also requested that TAYLOR provide additional law enforcement officers for the purported narcotics transaction. Later that same day, in a subsequent conversation, TAYLOR told UCA-1 that "the guy he was trying to get" was not available.

14.     On or about August 1, 2007, UCA-1 specifically told TAYLOR that UCA-1 was brokering an illegal narcotics transaction. UCA-1 further stated that the transaction involved "two kilos," and that it was not a lot but it could draw some attention. TAYLOR then agreed to provide armed security for the purported narcotics transaction. UCA-1 met TAYLOR at a local restaurant. UCA-1 approached the vehicle TAYLOR was driving. After a brief meeting, UCA-1 returned to his/her vehicle. TAYLOR followed UCA-1, and entered UCA-1's vehicle. UCA-1 and TAYLOR were observed by special agents driving around a nearby parking lot. UCA-1's vehicle was observed parked in a Target parking lot located at 17601 South Halstead Street, Homewood, Illinois. While

in the vehicle, UCA-1 asked TAYLOR, "What do they got you carrying?" TAYLOR responded that he had a "Sig Sauer Pro now," and then indicated that he had other weapons as well. In the presence of TAYLOR, UCA-1, via a cellphone, then directed two undercover special agents of the FBI who were posing as drug traffickers into the Target parking lot. When both undercover agents arrived, the purported narcotics transaction occurred in the parking lot of the Target Department Store. During the transaction, the undercover special agents exchanged packages in the parking lot. UCA-1 and TAYLOR observed the transaction while sitting in UCA-1's vehicle in the parking lot. While with UCA-1 in UCA-1's vehicle, TAYLOR inquired, "So you broker?" UCA-1 responded that he/she did and that it was "easy, it's cleaner" and that you don't need to mess "with anything." After the purported narcotics transaction occurred, the undercover agents departed the parking lot. UCA-1 then drove TAYLOR to his (TAYLOR's) vehicle. UCA-1 provided TAYLOR with $500.00 in pre-recorded United States currency as payment for providing armed security for the purported narcotics transaction.

## AUGUST 22, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL, and TAVIS RAMSEY

15. On or about August 13, 2007, UCA-1 had a discussion with RAPHAEL MANUEL at BUSINESS-1 regarding providing protection for narcotics transactions. UCA-1 informed MANUEL that he/she brokers deals involving "jewelry." UCA-1 then informed MANUEL that he/she wanted people that are armed to serve as security. UCA-1 stated the substances being brokered are "on occasion small amounts of weed and/or small amounts of cocaine." MANUEL stated that he had previously spoken with TAYLOR. MANUEL further stated that, "Me and Red [TAYLOR] we've been close and we actually know what's going on. So it's no problem and you

are in our best interest because we looking at doing deals with you in the future." UCA-1 stated to MANUEL that, "Sometimes a buddy calls me and says I need this, I need a kilo or whatever."[3] MANUEL further stated that he was aware of TAYLOR's previous assistance to UCA-1 during the August 1 transaction. MANUEL mentioned that he and TAYLOR could intercede with local law enforcement if needed during such transactions. MANUEL stated that, "We know how to politic with the local authorities in case they do try to stick their nose in stuff like that. Then that way it gives everybody else a chance to split." MANUEL continued by stating to UCA-1 that "I am looking forward to it, ya know what I am saying." Additionally, MANUEL stated to the UCA-1, "I've been associated with this, this industry for a minute here, it's all good with me."

16.     On or about August 20, 2007, UCA-1 spoke with MANUEL and asked him if he "was good for Wednesday," referring to providing protection for the purported narcotics transaction scheduled for Wednesday, August 22, 2007. MANUEL indicated he was available and requested UCA-1 to contact him with the location.

17.     On or about August 20, 2007, UCA-1 met both TAYLOR and MANUEL at BUSINESS-1. UCA-1 spoke with TAYLOR and said he/she (UCA-1) "was talking to Ray [RAPHAEL MANUEL]," and it was going to be "Wednesday about 1:00 p.m." TAYLOR then asked UCA-1 as to the location. UCA-1 informed TAYLOR that the location was to be somewhere between Harvey, Illinois, and Oak Lawn, Illinois. UCA-1 then informed MANUEL in passing at BUSINESS-1, "Red" [referring to TAYLOR], is "good."

---

[3]     Based on your Affiant's law enforcement experience, the term "kilo" typically represents kilogram quantities of illegal narcotics.

18.    On or about August 22, 2007, UCA-1 had a series of telephone conversations with TAYLOR and MANUEL. During the initial conversation, UCA-1 stated, "We're still on," and provided TAYLOR with the location of where they were going to meet. UCA-1 further inquired whether TAYLOR could obtain "a third guy" to assist in the purported narcotics transaction. TAYLOR agreed to try and locate a third person to assist. UCA-1 then stated that the individual needed to be "packing."[4] TAYLOR then asked, "Same deal?" [Affiant understands that reference to relate back to the August 1, 2007, purported narcotics transaction.] UCA-1 then told TAYLOR to let the other individuals involved to know, it's "the same deal." UCA-1 then left a voice mail message for MANUEL providing the location and time of the purported narcotics transaction. During a later telephone conversation with UCA-1, MANUEL stated that he was aware that TAYLOR was attempting to identify a third officer who would be willing to participate. In another telephone conversation, TAYLOR informed UCA-1 that he was en route to the vicinity of the narcotics protection operation. TAYLOR further stated to UCA-1 that "Raph" [MANUEL] should already be in the vicinity "and my other guy should be up there in about one minute."

19.    UCA-1 then met with MANUEL and "TAVIS" (who was later identified to be TAVIS RAMSEY by TAYLOR in a telephone conversation with UCA-1 on December 9, 2007). During this meeting, UCA-1 informed MANUEL and RAMSEY that the narcotics protection operation "this time I'm doing five kilos of coke." UCA-1 further instructed MANUEL and TAVIS to "be in touch" and if they "see anything that feels funny" for TAVIS to "be in touch with RAY" and they could end the exchange. UCA-1 then stated that "my guy initially we were just going to do 2 kilos of coke, and my guy called me and said I got my hands on five . . ." UCA-1 further related that he/she told his/her

---

[4]    I understand the term "packing," to mean carrying a weapon.

source to "bring all five" and then said "we could move it right away so it's like, it's a no brainer." Shortly after UCA-1 met with MANUEL and RAMSEY, TAYLOR arrived at the predetermined location. At that time, UCA-1 informed TAYLOR that the narcotics protection operation was "a little bigger than last time," and involved "five kilos."

20.     After this conversation, UCA-1, TAYLOR, MANUEL, and RAMSEY were observed by special agents driving in the vicinity of the Holiday Inn located at the southeast corner of 183rd Street and Harlem in Tinley Park, Illinois. Surveillance then observed TAYLOR parked on the south side of the Holiday Inn parking lot. A green minivan with an Illinois license plate was observed parked on the north side of 183rd Street across from the entrance to the Holiday Inn Hotel.[5] Two special agents of the FBI, acting in an undercover capacity as drug traffickers, were then directed by UCA-1 into the Holiday Inn Hotel parking lot. When both undercover agents arrived, the undercover meeting occurred in the parking lot of the Holiday Inn Hotel. During the meeting, the aforementioned special agents exchanged packages in the parking lot. Then, the two undercover agents departed from the parking lot. UCA-1, while in the parking lot of the Holiday Inn Hotel, provided TAYLOR, MANUEL, and RAMSEY with $500.00 each (totaling $1,500.00) in pre-recorded United States currency as payment for providing armed protection/security for the narcotics protection operation. After the meeting, surveillance Agents observed UCA-1, the vehicle driven by TAYLOR and the green minivan driven by RAMSEY depart the hotel parking lot.

---

[5] According to Illinois Secretary of State records, the green minivan was registered to AHYATARO TAYLOR.

## AUGUST 29, 2007 PURPORTED NARCOTICS TRANSACTION
## INVOLVING DWAYNE WILLIAMS and ANTOINE DUDLEY

21.     On or about August 27, 2007, UCA-1 and DWAYNE WILLIAMS, a Harvey Police Department officer, had a telephonic discussion regarding the protection of a narcotics shipment. Previously, during late May 2007, WILLIAMS had provided security for a purported illegal poker game involving special agents of the FBI acting in undercover capacities. The poker game involved in excess of $100,000 in cash being "exchanged" between the undercover agents. At the end of the game, WILLIAMS was paid $400 for providing security. In addition, on July 20, 2007, UCA-1 had discussed with DWAYNE WILLIAMS the prospect of WILLIAMS assisting UCA-1 with brokering future drug transactions.

22.     On August 27, 2007 UCA-1 informed WILLIAMS of a narcotics protection operation scheduled for Wednesday, August 29, 2007. During the telephone call, WILLIAMS stated that he currently was with ANTOINE DUDLEY. UCA-1 was familiar with ANTOINE DUDLEY, who was a police officer with the Harvey Police Department, because on or about May 29, 2007, and May 30, 2007, DUDLEY, provided UCA-1 with a security escort to a local business, at which time DUDLEY and another individual received $400 for providing security.

23.     While speaking with UCA-1 on August 27, 2007, WILLIAMS stated that DUDLEY was available to assist on Wednesday, August 29, 2007. UCA-1 then instructed WILLIAMS to speak with DUDLEY and told WILLIAMS to give DUDLEY "the scoop," and further stated that this transaction "going to be some, ya know, a little more hard core" than the last one. UCA-1 then discussed "briefing" everyone, and WILLIAMS suggested that they did not want to speak on the

telephone about it. WILLIAMS agreed to bring DUDLEY with him to meet UCA-1 at BUSINESS-1 the following evening.

24.     On or about August 28, 2007, UCA-1 had a meeting with WILLIAMS and DUDLEY. During this meeting, UCA-1 informed DUDLEY that he/she brokered "small quantities like marijuana or small quantities of cocaine" and that "none of it's sold here, it's all transferred out to either Indiana or Michigan." UCA-1 further stated that because the individuals involved were from out of town, UCA-1 preferred to have "security" present. UCA-1 further told DUDLEY and WILLIAMS that the narcotics protection operation scheduled for Wednesday, August 29, 2007 was for five kilograms of cocaine. According to UCA-1, the five kilograms of cocaine were to be exchanged in a hand-to-hand deal and DUDLEY and WILLIAMS were to provide security for the operation and to intercede if local law enforcement were in the area. UCA-1 offered both DUDLEY and WILLIAMS $400 for their participation. UCA-1 informed DUDLEY and WILLIAMS that the operation was to occur between Harvey, Illinois, and Oak Lawn, Illinois, between the hours of 12:00 p.m. and 1:00 p.m. DUDLEY stated to UCA-1 that there were, "No problems." DUDLEY provided UCA-1 with his telephone number (708) 473-XXXX.[6]

25.     On or about August 29, 2007, UCA-1 contacted DUDLEY and WILLIAMS in reference to meeting at the undercover residence prior to the narcotics protection operation scheduled for the same date. Later that same day, both DUDLEY and WILLIAMS arrived at the undercover residence which was equipped with audio and video recording equipment. Recordings of the aforementioned meeting were obtained. During review of the video recording, it was apparent that

---

[6] Subscriber records show that telephone number (708) 473-XXXX is subscribed to be ANTONIE DUDLEY, Harvey, Illinois. "XXXX" has been used for privacy purposes.

DUDLEY possessed a firearm. Additionally, UCA-1 asked both DUDLEY and WILLIAMS whether they were armed. Both DUDLEY and WILLIAMS acknowledged in the affirmative by nodding their heads. During the meeting, WILLIAMS and UCA-1 discussed the location of the transaction. UCA-1 indicated that the transaction may occur at a nearby hotel parking lot because of its size and "no one pays attention to shit right there and it's pretty quiet." WILLIAMS responded by saying they should check for "cameras" and how they're "angled" [referring to the angles of the cameras]. UCA-1, DUDLEY, and WILLIAMS then departed the undercover residence.

26.     On or about August 29, 2007, UCA-1's vehicle was observed arriving at the Oak Lawn Hilton located at 9333 South Cicero Avenue, Oak Lawn, Illinois. UCA-1's vehicle parked in the hotel parking lot in the southeast corner. UCA-1 was accompanied by DUDLEY as a passenger. After several minutes, agents observed a grey/silver four-door Buick arrive.[7] Surveillance Agents observed WILLIAMS in the Buick and DUDLEY as a passenger in UCA-1's vehicle. UCA-1, in the presence of DUDLEY, then directed two special agents of the FBI, acting in an undercover capacity as drug traffickers, into the Oak Lawn Hilton hotel parking lot. When the agents arrived, the undercover meeting occurred in the parking lot of the Oak Lawn Hilton hotel. During the meeting, the agents exchanged packages in the parking lot. After the meeting occurred, the undercover agents departed from the parking lot. After the meeting, agents observed WILLIAMS drive over to UCA-1's vehicle. DUDLEY, WILLIAMS, and UCA-1 then had a conversation outside of the vehicles. Agents observed UCA-1 pay DUDLEY and WILLIAMS $400 each for their participation in the

_____

[7] The Buick vehicle possessed an Illinois license plate which according to Illinois Secretary of State records was registered to ANTOINE D. DUDLEY.

narcotics protection operation. Agents observed DUDLEY and WILLIAMS then depart the area in the Buick with WILLIAMS driving.

## SEPTEMBER 14, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL, JERMAINE BELL and TAVIS RAMSEY

27.     On or about September 11, 2007, UCA-1 had a telephone conversation with TAYLOR. UCA-1 informed TAYLOR that he/she had "something going on." UCA-1 said it was "bigger," and requested TAYLOR to provide six "guys" [meaning law enforcement officers] to assist. TAYLOR told UCA-1 that he had "four" [meaning law enforcement officers]. UCA-1 told TAYLOR to make sure they were people TAYLOR could "trust." UCA-1 suggested that TAYLOR speak with MANUEL, and TAYLOR agreed to do so. In a second call, TAYLOR told UCA-1 that he and "Ray" [MANUEL] would come by BUSINESS-1 to discuss the transaction.

28.     On or about September 11, 2007, UCA-1 met with TAYLOR and MANUEL at BUSINESS-1. UCA-1 informed TAYLOR and MANUEL that he had been in Florida and worked out a larger deal while in Miami. TAYLOR asked UCA-1 about the "pay scale." UCA-1 told TAYLOR and MANUEL that they would receive $1,000.00 each and the other two law enforcement officers would receive $500.00 each because they (TAYLOR and MANUEL) were "coordinating everything." TAYLOR and MANUEL then discussed whether they needed "six people," [meaning law enforcement officers] and the risks of including more people. UCA-1 told TAYLOR and MANUEL that the narcotics shipment and transaction was for "twenty-five kilos of cocaine," and one "kilo of heroin." UCA-1 stated, "We're doing the brokering again," and "we're not touching anything." TAYLOR told UCA-1 that, "as far as product, we don't want to know." TAYLOR further stated that he and MANUEL just simply wanted to know how many officers they needed to

have participate. TAYLOR and MANUEL offered UCA-1 their opinion on utilizing a four-officer team as opposed to a larger number of officers. TAYLOR then stated, "I'm just now getting my security team intact." TAYLOR discussed getting "Boost phones" for the other officers who were to participate. UCA-1 stated to TAYLOR and MANUEL that he/she only brokered the narcotics transaction, to which MANUEL responded that UCA-1 has "plausible deniability."

29.     During this same conversation, UCA-1 requested that TAYLOR and MANUEL bring their people on Thursday so UCA-1 could meet them. TAYLOR stated that "TAVIS" [referring to TAVIS RAMSEY] was not available on Thursday to meet in advance of the deal. TAYLOR and UCA-1 then discussed that UCA-1 had already met "TAVIS" and "TAVIS" knew the routine. TAYLOR then said he had talked to "the other guy" and, "he's also a Cook County Sheriff." TAYLOR said he spoke with "the other guy" after the last time [making reference to the August 22, 2007, narcotics protection operation]. The other guy told TAYLOR, "if you have anything else, let me know, I want to do it with you." TAYLOR said he had talked to the "other guy . . . the day after" [referring to the last deal] and explained this was no "kiddy talk" and "we don't play no games."

30.     On or about September 13, 2007, UCA-1 met with TAYLOR and JERMAINE BELL (later identified by Illinois Secretary of State driver's license photograph, license plate registration, and Cook County records) at BUSINESS-1. Agents obtained both audio and video recordings of this meeting. During the meeting, UCA-1 asked BELL if he was employed by Cook County and if BELL was armed. BELL responded in the affirmative. UCA-1 informed TAYLOR and BELL that he/she needed assistance in "brokering" a transaction. UCA-1 stated, "we want to secure the area," "have my people meet" and want to make sure "they never get ripped." UCA-1 then instructed that they should use "their badges" to intercede if any law enforcement should appear. UCA-1 then stated that

the transaction involved, "about twenty-five kilos of coke and one kilo of heroin." TAYLOR stated that the prior narcotics operation [referring to August 22, 2007] took fifteen minutes. UCA-1 advised TAYLOR and BELL that, "...one guy [individual involved in the narcotics transaction] goes to Indiana, the other one goes all the way to Michigan." UCA-1 informed BELL that he would receive $500.00 in United States currency for his participation in the narcotics protection operation. UCA-1 said it was "simple," and "like I said nobody gets their hands dirty."

31. On or about September 14, 2007, UCA-1 had a telephonic conversation with TAYLOR and confirmed the place and time for the proposed narcotics transaction.

32. On or about September 14, 2007, agents observed UCA-1 meet with TAYLOR, who was driving a black Suburban; BELL, who was driving a black Toyota;[8] RAPHAEL MANUEL, who was driving a champagne Avalanche;[9] and RAMSEY, who was driving a green minivan. All of them met in the parking lot of the Applebee's Restaurant located at 16200 South Harlem Avenue, Tinley Park, Illinois, and then departed the Applebee's Restaurant and proceeded to the Holiday Inn located on the southeast corner of 183rd Street and Harlem Avenue in Tinley Park, Illinois.

---

[8] During the conversation, TAYLOR describes the vehicle as a "black Honda Civic," but based on physical surveillance and registration information, the vehicle was a Toyota. UCA-1 obtained the license plate of the vehicle being driven by BELL. A records check revealed that the vehicle was registered Enterprise Leasing Company. During conversation with UCA-1, BELL stated that his vehicle was a rental car, necessitated by a mechanical problem with BELL's personal vehicle.

[9] According to Illinois Secretary of State Records, the license plate observed on the Avalanche was registered to RAPHAEL MANUEL.

33.     Subsequently, surveillance agents observed as the Suburban (TAYLOR's vehicle),[10] Avalanche (MANUEL's vehicle), and Toyota (BELL's vehicle) entered the Holiday Inn parking lot while the green minivan (RAMSEY's vehicle) remained on the north side of 183rd Street directly across from the entrance to the Holiday Inn. Special agents of the FBI, acting in an undercover capacity as narcotics traffickers, were then directed by UCA-1 into the Holiday Inn parking lot. When both undercover agents arrived, the undercover agents met in the parking lot of the Holiday Inn hotel. During the meeting, the aforementioned special agents exchanged packages of supposed cocaine, heroin, and United States currency in the parking lot. After the meeting occurred, the undercover agents left the parking lot.

34.     Agents then observed TAYLOR and MANUEL depart the Holiday Inn following the undercover agents who had just engaged in a purported narcotics operation. TAYLOR and MANUEL proceeded eastbound on Interstate 80 for a short period and then returned to the Holiday Inn parking lot. In TAYLOR and MANUEL's absence, UCA-1 met with BELL and RAMSEY. During UCA-1's meeting with BELL and RAMSEY, UCA-1 paid each $500.00 in pre-recorded United States currency for their participation in the purported narcotics transaction, and stated "thank you for your services." Upon TAYLOR and MANUEL's return to the Holiday Inn parking lot, UCA-1 provided each with $1,000.00 in pre-recorded United States currency for their participation in the purported narcotics transaction, and stated he/she had "already paid them (BELL and RAMSEY) $500 each."

---

[10]     In this paragraph, I use these labels for vehicles for ease of reference to the Court, and not to suggest that each vehicle is owned and/or registered to the individual noted.

## OCTOBER 24, 2007 PURPORTED NARCOTICS TRANSACTION
## INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL,
## KYLE WILSON, and TAVIS RAMSEY

35.     On or about October 18, 2007, UCA-1 met with TAYLOR and MANUEL at

BUSINESS-1. During this meeting, UCA-1, TAYLOR, and MANUEL discussed recruiting

additional law enforcement officers to assist in future narcotics protection operations. TAYLOR

asked "how many do you need," and indicated that he could get as many officers as UCA-1 needed.

UCA-1 instructed TAYLOR and MANUEL to get a "good size crew" and they could then "rotate"

so the officers involved would not be aware of all the narcotics transactions. UCA-1, TAYLOR, and

MANUEL then discussed their availability on the upcoming Wednesday or weekend for another

narcotics transaction. Agents obtained video surveillance of this meeting.

36.     During this conversation, UCA-1 explained that a "Harvey guy" who "is on a task

force" [an officer involved in drug investigations] told UCA-1 that "a memo" came across his desk

indicating that "they're [law enforcement officers] looking at" a drug dealer from Las Vegas. UCA-1

explained that s/he "dumped" his/her phone, but the task force officer later told UCA-1 that the target

being investigated from Las Vegas was not UCA-1. MANUEL told UCA-1 that he and TAYLOR

were from Cook County, and they knew what was going on. TAYLOR stated that he had several

"buddies" from the Sheriff's police and that he would get "wind" of an active investigation focusing

on UCA-1.

37.     On or about October 22, 2007, UCA-1 had a telephonic conversation with TAYLOR

regarding an upcoming narcotics protection operation scheduled for Wednesday, October 24, 2007.

UCA-1 stated, "We should be good for Wednesday," and then asked TAYLOR if he got "one or two

more guys," and then asked TAYLOR to bring them to BUSINESS-1 so UCA-1 could meet them.

38.     On or about October 23, 2007, UCA-1, while at BUSINESS-1, met with TAYLOR, MANUEL, KYLE WILSON (later identified by Illinois Secretary of State license plate registration and positively identified by UCA-1 by review of Illinois driver's license photograph) who was introduced as a Chicago Police Department officer, and an unidentified individual (hereafter as Individual C.) UCA-1 initially spoke with TAYLOR and MANUEL in reference to the upcoming narcotics protection operation to take place on Wednesday, October 24, 2007. During this portion of the conversation, UCA-1 asked if they "told em [referring to WILSON and Individual C] what they got to do?" TAYLOR responded in the affirmative. Shortly thereafter, WILSON and Individual C joined the meeting. UCA-1 asked WILSON and Individual C if "they [TAYLOR and MANUEL] filled ya'll in" on "what we're going to do." UCA-1 proceeded to explain in detail what would occur during the narcotics transaction, that they would be providing security throughout the narcotics transaction, and stated that "my guys" would arrive Wednesday morning and "should be easy in, easy out," and "make sure my guys are safe." UCA-1 then inquired if WILSON and Individual C could carry their weapons off duty, to which Individual C and WILSON both responded in the affirmative. UCA-1 further explained, "It's going to be a decent amount of money transaction," and, "it gonna be probably the same, 25 kilos coke, one kilo of heroin, and the money exchange." WILSON provided UCA-1 with telephone number as a means of reaching him, as did Individual C. UCA-1 provided his cell phone number to WILSON and Individual C and stated his phone was "clean." UCA-1 observed WILSON depart BUSINESS-1 in a white Chevrolet Avalanche bearing an Illinois license plate.[11]

--------

[11] According to Illinois Secretary of State records, the license plate number observed by agents is registered to KYLE T. WILSON, in Country Club Hills, Illinois.

39.     On or about October 24, 2007, UCA-1 had a telephonic conversation with TAYLOR to advise TAYLOR of the meeting location and the time for the purported narcotics transaction scheduled for that day.  UCA-1 requested that TAYLOR contact the participants of the purported narcotics transaction to inform them of the transaction.

40.     Later on October 24, 2007, UCA-1 met with TAYLOR, MANUEL, TAVIS RAMSEY, and KYLE WILSON at the Cracker Barrel Restaurant located at 18531 North Creek Drive, Tinley Park, Illinois.  TAYLOR informed UCA-1 that Individual C's grandmother was ill and in the hospital.  TAYLOR further said that RAMSEY was to replace Individual C during the narcotics protection operation.  UCA-1 then met with TAVIS RAMSEY, and discussed the general plan for the narcotics deal.  UCA-1 stated, "You've got perimeter again," and explained the deal involved "a lot of money and 25 kilos of cocaine and one of heroin," and to "stay sharp, same thing." UCA-1 then introduced TAVIS to KYLE, and discussed, "You guys got the perimeter" and "stay sharp and watch each others' back and watch our backs."  During this meeting, RAMSEY stated that he worked as a police officer for the Posen Illinois Police Department.[12]

41.     Following this meeting, all of the above-named individuals relocated to the vicinity of the Holiday Inn located at 18501 South Harlem Avenue, Tinley Park, Illinois.  UCA-1 then directed special agents of the FBI, acting in an undercover capacity as narcotics traffickers, into the Holiday Inn parking lot.  When the undercover agents arrived, the undercover meeting occurred in

_____

[12]At this time, the FBI is unable to confirm RAMSEY's employment.  During a meeting with TAYLOR on December 10, 2007, UCA-1 asked TAYLOR about whether RAMSEY really was employed by Posen Police Department.  TAYLOR stated that he spoke with RAMSEY regarding the issue and RAMSEY told TAYLOR that he was just uncomfortable telling UCA-1 where he actually worked.  MANUEL further stated that he (MANUEL) did security work with RAMSEY.  Further investigation has suggested that RAMSEY is not a law enforcement officer.

the parking lot of the Holiday Inn hotel. During the meeting, the special agents exchanged packages of supposed cocaine, heroin, and United States currency in the parking lot. After the meeting occurred, the undercover agents departed from the parking lot.

42.    Surveillance agents observed TAYLOR and MANUEL depart the Holiday Inn following the undercover FBI agents who were acting as narcotics traffickers. TAYLOR and MANUEL proceeded eastbound on Interstate 80 for a short period. During this time, surveillance agents observed UCA-1 pay RAMSEY and WILSON for their participation in the narcotics protection operation. UCA-1 provided RAMSEY and WILSON each with $500 in pre-recorded United States currency for their participation in the narcotics protection operation. UCA-1 explained that he has "Red [TAYLOR] and Ray [MANUEL] follow 'em a couple of exits down the highway, make sure nobody's on their tail." After TAYLOR and MANUEL returned to the parking lot, UCA-1 provided TAYLOR and MANUEL each with $1,000.00 in pre-recorded United States currency for their participation in the narcotics protection operation.

### NOVEMBER 16, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL, TIMOTHY FUNCHES, JR., and DIALLO S. MINGO

43.    On or about October 30, 2007, UCA-1 met with TAYLOR and MANUEL at the undercover residence to discuss previous and future narcotics transactions. Agents obtained both audio and video recordings of the aforementioned meeting with TAYLOR and MANUEL. During this meeting, UCA-1 requested that TAYLOR and MANUEL have the presence of a marked law enforcement vehicle during the narcotics protection operations. MANUEL stated, "That interference can be done by us." MANUEL advised that if they were notified of a cop car coming, "I could jump out, be like, okay, I could flag them down, I'm an officer." MANUEL stated, "Just identify myself

as an officer, to any squad and be it know that I've got jurisdiction because we are Cook County Sheriffs."

44.    During the same conversation, there was a general discussion regarding the law enforcement officers TAYLOR and MANUEL solicited for assistance in the narcotics protection operations. UCA-1 inquired as to TAYLOR and MANUEL's pitch to the other officers to gain their participation in the narcotics operation. MANUEL replied that they would inform the officers that they know of a guy who, "...brokers deals." TAYLOR stated that he wanted the other officers to know that they were covering him (TAYLOR) and that there could not be any screw-ups.

45.    On or about November 12, 2007, UCA-1 met with TAYLOR at BUSINESS-1. During this meeting, TAYLOR informed UCA-1 that he and MANUEL had three teams ready for future narcotics protection operations and that he would put together additional teams. UCA-1 told TAYLOR that he was doubling the quantity and asked TAYLOR what TAYLOR felt was "fair" to receive as payment for his participation in the narcotics protection operation. TAYLOR stated that he had to talk with MANUEL, but felt "15" ($1,500.00) was fair. UCA-1 stated that he was increasing the narcotics shipments from twenty-five kilograms of cocaine and one kilogram of heroin to two or three kilograms of heroin and fifty kilograms of cocaine. UCA-1 and TAYLOR further negotiated the payments to the law enforcement officers participating in the narcotics protection operations. TAYLOR informed UCA-1 that TAYLOR would bring the new law enforcement officers to either TAYLOR's or MANUEL's house and inform them of what the narcotics protection operation entailed. UCA-1 informed TAYLOR that UCA-1 wanted to meet the two new law enforcement officers prior to the narcotics protection operation.

46.     On or about November 14, 2007, UCA-1 had telephonic contact with TAYLOR to arrange a location for UCA-1 to meet the two new law enforcement officers who were to participate in the upcoming narcotics protection operation. TAYLOR stated that he and the two new law enforcement officers were meeting at his residence on 55th Street, four blocks east of Halstead Avenue, prior to their meeting with UCA-1 later that evening. UCA-1 then had telephonic contact with MANUEL. During that conversation, UCA-1 discussed the "new pay scale" and that MANUEL would receive $2,000.00 in United States currency for his participation. UCA-1 further informed MANUEL that the narcotics quantities were doubling and "...going to be fifty and two or three." MANUEL acknowledged this and stated that he would see UCA-1 on Friday.

47.     Later that evening, UCA-1 met with TAYLOR, TIMOTHY FUNCHES, JR., and DIALLO S. MINGO at a Burger King Restaurant located at 5211 South Cicero Avenue, Chicago, Illinois.[13] During the surveillance, an FBI agent entered the Burger King and observed three adult black males (one identified to be TAYLOR and two later identified as FUNCHES and MINGO based upon drivers' license photographs) and one juvenile black male in the company of UCA-1. UCA-1 introduced him/herself to the law enforcement officers. FUNCHES introduced himself as "Tim," and the second black male as "DIALLO," who stated "Just call me D." UCA-1 asked if TAYLOR "pretty much explained everything?" UCA-1 then stated "A little background on me, I do a little brokering here and there." UCA-1 then stated, "It's going to be two or three kilos, actually two kilos of heroin." UCA-1 then stated, "You guys are going to be in the perimeter. . . .You make sure nobody follows my guys in and nobody follows my guys out." UCA-1 then discussed using

_____

[13] While conducting surveillance of this meeting, agents observed what appeared to be a white Saturn Ion bearing Illinois an license plate. According to Illinois Secretary of State records, the license plate observed by agents is registered to TIMOTHY FUNCHES, Lansing, Illinois.

"radios" [walkie talkies] to communicate during the transaction to report any suspicious vehicles. TAYLOR then stated everyone has "Nextels." UCA-1 stated, "Nobody is going to get their hands dirty and nobody touches anything." UCA-1 stated the goal is to make sure "nothing happens" to UCA-1's associates. UCA-1 stated that the purported narcotics transaction was scheduled for Friday, November 16, 2007, between the hours of 11:00 a.m. and noon. UCA-1 informed FUNCHES and MINGO that they would receive $1,000.00 in United States currency for their participation. One of the law enforcement officers stated that he has worked for "the County" [Cook County] for three years and worked the following areas: 61st and Cottage Grove, in the "projects," and Hyde Park. UCA-1 asked what type of firearm he carried and the officer responded by stating a Glock 17, 9mm. The second law enforcement officer stated that he worked in the same department as the first officer.

48.    At the conclusion of the above-described meeting, UCA-1 asked TAYLOR for "somebody that's local," who could "handle like an eight-ball or something or an ounce." TAYLOR responded, "Oh okay, oh yeah, I know someone." Your affiant is aware that an "eight-ball" is a commonly used term to describe an eighth-ounce quantity of cocaine.

49.    On or about November 16, 2007, UCA-1 had telephonic contact with TAYLOR to set the location for everyone to meet prior to the purported narcotics transaction planned for the same day. UCA-1 requested that TAYLOR inform the other officers to meet at the Cracker Barrel located in Matteson, Illinois, near Interstate 57 and Route 30/Lincoln Highway.

50.    On or about November 16, 2007, UCA-1 met with TAYLOR, MANUEL, TIMOTHY FUNCHES (hereinafter referred to as "FUNCHES"), and MINGO at the Cracker Barrel Restaurant located in Matteson, Illinois. During this meeting, UCA-1, TAYLOR, MANUEL, FUNCHES, and MINGO developed a tactical plan for the purported narcotics transaction to take place shortly

thereafter at the Holiday Inn Hotel in Matteson, Illinois. TAYLOR stated that they "had already ready rode through" [conducted surveillance of] the Holiday Inn parking lot and surrounding area.

51.    At the conclusion of the meeting, UCA-1, TAYLOR, MANUEL, FUNCHES, and MINGO drove to the area of the Holiday Inn located at 500 Holiday Plaza Drive, Matteson, Illinois. UCA-1 then directed special agents of the FBI, acting in an undercover capacity as narcotics traffickers, into the Holiday Inn parking lot. When both undercover agents arrived, the purported narcotics transaction occurred in the parking lot of the Holiday Inn hotel. During the transaction, the undercover agents exchanged packages of supposed cocaine, heroin, and United States currency in the parking lot. Surveillance agents observed TAYLOR and MANUEL in vehicles in close proximity to the two undercover agents during the purported narcotics transaction. FUNCHES and MINGO were in vehicles that remained in the general vicinity. After the meeting occurred, the undercover agents posing as narcotics traffickers departed from the parking lot. After the two undercover agents departed, TAYLOR, MANUEL, FUNCHES, and MINGO drove and then parked in the northwest corner of the Holiday Inn parking lot, next to UCA-1's vehicle. While parked in the northwest corner of the Holiday Inn parking lot, the drivers exited their vehicles and met with UCA-1. During UCA-1's meeting with TAYLOR, MANUEL, FUNCHES, and MINGO, UCA-1 paid TAYLOR and MANUEL $2,000.00 each for their participation in the narcotics protection operation. UCA-1 then provided FUNCHES and MINGO $1,000.00 each for their participation in the narcotics protection operation.

52.    Surveillance agents obtained photographs, fixed video, and aerial video during the aforementioned narcotics protection operation. Additionally, agents obtained license plate information on the following vehicles: black Suburban, registered per Illinois Secretary of State

records to DWIGHT E. TAYLOR; champagne Avalanche, registered per Illinois Secretary of State records to RAPHAEL MANUEL; white Saturn, registered per Illinois Secretary of State records to TIMOTHY FUNCHES; and grey Honda, registered per Illinois Secretary of State records to DIALLO MINGO.

### NOVEMBER 30, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL, ANTWON FUNCHES, and ANTONIO McCASKILL

53.     On or about November 27, 2007, and November 28, 2007, UCA-1 had telephonic contact with MANUEL. UCA-1 asked MANUEL if he (MANUEL), "got his two new guys lined up." MANUEL responded, "Yes I do." UCA-1 discussed meeting them the following day. UCA-1 asked "are these guys cool? You talked to 'em and everything?" MANUEL responded, "They're good. I've got 'em on line. We had 'em set up. . .We interviewed 'em today. Got it all set-up already." During a second telephonic conversation held on November 28, 2007, MANUEL stated that "one of the new guys" had a funeral to attend during the planned upcoming narcotics transaction on Friday, November 30, 2007. MANUEL stated that he did not want to use the second officer as to prevent splitting up that new "team," and added "we already got three teams." MANUEL advised UCA-1 that he had another new law enforcement officer and that he was meeting TAYLOR later that day to determine if TAYLOR had a new officer identified. MANUEL told UCA-1 that they (MANUEL and TAYLOR) would "make it happen."

54.     Following this conversation, MANUEL telephonically contacted UCA-1 and stated that he and TAYLOR "got two new guys." MANUEL stated that the he, TAYLOR, and the two new guys were planning to meet at TAYLOR's residence and subsequently call UCA-1 to meet with

him/her. UCA-1 and MANUEL arranged to meet at 7:00 p.m. at the Burger King Restaurant located on South Cicero near 52nd Street. UCA-1 inquired from MANUEL if "these guys worked with you?" MANUEL said, they're both "county guys" [worked for the Cook County Sheriff's Office]. UCA-1 responded, "Beautiful." UCA-1 asked, "You gave 'em the spiel and everything?" MANUEL stated, "Yeah, I do security with them at this other place."

55.    MANUEL telephonically contacted UCA-1 again later that day to inform UCA-1 that he and the two new officers were on their way to the Burger King to meet with UCA-1. UCA-1 inquired of MANUEL, "You brief 'em, they OK with everything, we cool?" MANUEL responded, "Yeah, yeah, yeah."

56.    On or about November 28, 2007, UCA-1 met with MANUEL, ANTWON FUNCHES[14] and ANTONIO MCCASKILL at the Burger King Restaurant located at the corner of South Cicero Avenue and 52nd Street.[15] MCCASKILL and ANTWON FUNCHES stated that they work together and knew each other through part time jobs. UCA-1 asked if MCCASKILL and ANTWON FUNCHES had "talked to Ray [MANUEL] and Red [TAYLOR]" and "you know the scoop?" UCA-1 continued, "Simple, nobody touches anything. Nobody gets their hands dirty. I need security." UCA-1 explained that, "Ray and Red know what the deal is" and will direct them to the location. UCA-1 explained, "I usually broker a couple deals, uh, now and then, sporadically." UCA-1 told MCCASKILL and ANTWON FUNCHES that each would be paid $1,000.00 "for your hard day's work." UCA-1 stated that law enforcement officers were asked to assist because "you're

[14]    Based on the investigation, ANTWON FUNCHES is not related to the previously identified TIMOTHY FUNCHES, JR.

[15]    Both FUNCHES and MCCASKILL were later positively identified by UCA-1 based upon drivers' license photographs.

already packaged, trained, and everything." One of the officers (either ANTWON FUNCHES or MCCASKILL) stated that he worked for Cook County in the jail. UCA-1 informed MANUEL, ANTWON FUNCHES, and MCCASKILL that the narcotics transaction was "just going to be two kilos of heroin." Either ANTWON FUNCHES or MCCASKILL then stated that "Ray [MANUEL] was pretty good about answering all our questions." The other then said, "We already know. That's why he called only a few, only a few." UCA-1 told the officers that the narcotics transaction was scheduled for Friday, November 30, 2007, and to be ready at 11:00 a.m. MANUEL stated that "it's gonna be another smooth operation."

57. On or about November 30, 2007, UCA-1 had telephonic contact with TAYLOR. UCA-1 informed TAYLOR to "have the fellas ready to roll" by noon and that the narcotics transaction was to occur between 1:00 p.m. and 1:30 p.m. TAYLOR inquired as to the location. UCA-1 informed TAYLOR that it "is probably gonna be one of the one's we've already done . . . you know the locations."

58. On or about November 30, 2007, UCA-1 had telephonic contact with MANUEL. During the conversation UCA-1 informed MANUEL to be ready by noon. UCA-1 further informed MANUEL that the narcotics transaction was to occur between 1:00 p.m. and 1:30 p.m. MANUEL stated to UCA-1 that TAYLOR was "chirping"[16] him at that current time.

59. On or about November 30, 2007, UCA-1 had telephonic contact with TAYLOR. During the conversation, UCA-1 informed TAYLOR that the location for the narcotics protection operation was to be in Matteson, Illinois. UCA-1 stated that he/she was at the Cracker Barrel in

---

[16] Your Affiant knows the term "chirping" to refer to the communications derived from the Nextel push-to-talk feature.

Matteson, Illinois. UCA-1 further stated that the narcotics protection operation was scheduled for 1:00 p.m. TAYLOR advised UCA-1 that he was in Dolton, Illinois, and that he would have the other officers go to the Cracker Barrel in Matteson, Illinois.

60.    On or about November 30, 2007, UCA-1 met with TAYLOR, MANUEL, ANTWON FUNCHES, and MCCASKILL at the Cracker Barrel Restaurant located in Matteson, Illinois.[17] During the meeting, agents observed what appeared to be a law enforcement badge hanging from TAYLOR's neck. At the conclusion of the meeting, UCA-1, TAYLOR, MANUEL, ANTWON FUNCHES, and MCCASKILL proceeded to the area of the Holiday Inn located at 500 Holiday Plaza Drive, Matteson, Illinois. UCA-1 observed that MCCASKILL was a passenger in ANTWON FUNCHES' vehicle during the narcotics protection operation. UCA-1 then directed special agents of the FBI, acting in an undercover capacity as narcotics traffickers, into the Holiday Inn parking lot. When the undercover agents arrived, the purported narcotics transaction occurred in the parking lot of the Holiday Inn hotel. During the meeting, the undercover agents exchanged packages of supposed heroin and United States currency in the parking lot. Surveillance agents observed TAYLOR and MANUEL's vehicles in close proximity to the two undercover agents during the purported narcotics transaction. ANTWON FUNCHES' vehicle (with MCCASKILL as a passenger) remained in the general vicinity.

---

[17]    Surveillance agents observed the following four vehicles at the Cracker Barrel and throughout the purported narcotics transaction: a black Suburban (observed during previous narcotics protection operations to be driven by TAYLOR), a champagne Avalanche (observed during previous narcotics protection operations to be driven by MANUEL), a minivan bearing an Illinois license plate which number is, according to Illinois Secretary of State records, registered to ANTWON FUCHES, and a Chrysler 300 bearing an Illinois license plate, which is, according to Illinois Secretary of State records, registered to ANTONIO MCCASKILL.

61.    After the meeting occurred, the undercover agents posing as narcotics traffickers departed from the parking lot. After the two undercover agents departed, TAYLOR, MANUEL, ANTWON FUNCHES, and MCCASKILL met in the northwest corner of the Holiday Inn parking lot, in the immediate vicinity of UCA-1's vehicle. While parked in the northwest corner of the Holiday Inn parking lot, the drivers exited the vehicles and met with UCA-1. During UCA-1's meeting with TAYLOR, MANUEL, ANTWON FUNCHES, and MCCASKILL, UCA-1 paid TAYLOR and MANUEL $2,000.00 each for their participation in the narcotics protection operation. UCA-1 then provided ANTWON FUNCHES and MCCASKILL $1,000.00 each  for their participation in the narcotics protection operation.

62.    Surveillance agents obtained photographs and fixed video during the aforementioned narcotics protection operation.[18]

### DECEMBER 10, 2007 PURPORTED NARCOTICS TRANSACTION INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL, DANIEL LEE, and JULIUS SCOTT

63.    On or about December 3, 2007, UCA-1 had telephonic contact with TAYLOR. UCA-1 informed TAYLOR that there might be another narcotics transaction for the following Tuesday, December 11, 2007, and asked TAYLOR if he had "two new guys? You have a new team set-up, right?" TAYLOR responded affirmatively by stating, "Um-hum." UCA-1 then stated he

---

[18]    During the process of transferring the data from the digital recording device worn by UCA-1 to a compact disc, a hardware error was displayed on the transfer software. The recording equipment was transferred from UCA-1 to an FBI Agent for technical evaluation purposes. It was subsequently determined by the FBI Chicago Division Technical Squad to have malfunctioned. The conversation between UCA-1 and MANUEL, TAYLOR, ANTWON FUNCHES, and MCCASKILL was not initially stored on the recording device and therefore, was impossible to recover.

wanted to meet either Wednesday or Thursday of that week because UCA-1 "may have a good deal going down."

64. On or about December 4, 2007, UCA-1 had telephonic contact with MANUEL. MANUEL stated that they (TAYLOR and MANUEL) "got two fresh new," referring to individuals for the purported narcotics transaction. MANUEL stated that he was attempting to arrange for the two new officers to meet UCA-1 the following night between 5:00 p.m. and 6:00 p.m.

65. On December 4, 2007, UCA-1 met with MANUEL at BUSINESS-1. UCA-1 informed MANUEL that he "may have something set-up for Monday or Tuesday," of the following week. MANUEL informed UCA-1 that the two new officers were "DAN" and "JULIUS." MANUEL further stated that "DAN" was employed with the Cook County Courts and worked with MANUEL and ANTWON FUNCHES, and JULIUS was employed with "Cook County Juvenile." MANUEL stated that he worked part-time jobs with DAN and JULIUS.

66. On or about December 5, 2007, UCA-1 had telephonic contact with MANUEL. MANUEL informed UCA-1 that he was, "...going to make it happen in a little while," and would be moving in thirty to forty-five minutes. MANUEL stated that he would "text" UCA-1 when ready. UCA-1 then informed MANUEL to meet at the Olive Garden Restaurant at 5:00 p.m.

67. On or about December 5, 2007, UCA-1 changed the location of the meeting from Olive Garden to the Applebee's Restaurant located 7601 South Cicero Avenue, Chicago, Illinois. UCA-1 arrived at the Applebee's Restaurant and telephonically contacted MANUEL. UCA-1 asked MANUEL what vehicles his guys were driving. UCA-1 stated to MANUEL that he/she thought one of the officers just pulled up next to UCA-1's vehicle. UCA-1 observed a maroon colored Pontiac

Grand Prix bearing an Illinois license plate.[19] UCA-1 also observed a dark colored sport utility vehicle, but, was unable to view the license plate. Agents conducting surveillance of this meeting obtained the Illinois license plate of the vehicle identified by UCA-1.[20] UCA-1 made contact with the individuals parked next to his/her vehicle and advised them that MANUEL was on his way to the location.

68.     Shortly thereafter, UCA-1 and MANUEL entered the Applebee's restaurant.[21] Upon entering the Applebee's Restaurant, UCA-1 was introduced to "DAN," later identified to be DANIEL L. LEE, and "JULIUS," later identified to be JULIUS L. SCOTT, JR.[22] UCA-1 explained to MANUEL, LEE, and SCOTT that, " I broker a couple of these a year for some friends of mine," and, "...we don't touch anything." UCA-1 further stated that TAYLOR and MANUEL "have offered

---

[19]     Per Illinois Secretary of State records, the license plate number observed by agents is registered to DANIEL LEE, Hazelcrest, Illinois.

[20]     Per Illinois Secretary of State records, the license plate number observed by agents is registered to Individual D, who resides in Chicago, Illinois.

[21]     For the prior several days, UCA-1 and MANUEL had been negotiating a narcotics deal, in which MANUEL agreed to provide UCA-1 with an ounce of "crack" cocaine in exchange for a sum of money. During the negotiations, MANUEL asked whether UCA-1 wanted the cocaine "cooked," and UCA-1 replied that he did. Upon arriving at the Applebees on December 5, 2007, MANUEL first got into UCA-1's vehicle, and gave UCA-1 a package of what appeared to be cocaine in exchange for $800. The substance given to UCA-1 by MANUEL was later submitted to the United States Department of Justice, Drug Enforcement Administration (DEA) Laboratory for analysis. Per the DEA Laboratory, the substance supplied by MANUEL to UCA-1 tested positive for Cocaine Hydrochloride with a net weight of 27.6 grams and 71.2% concentration/purity level. Although UCA-1 requested "crack" cocaine, MANUEL provided cocaine in powder form. After this exchange, UCA-1 and MANUEL entered the Applebee's together.

[22]     In a conversation with UCA-1 on December 10, 2007, SCOTT provided his last name. UCA-1 positively identified both officers subsequent to this meeting, based upon drivers' license photographs.

me a service that I find very valuable making sure everything goes smooth for my guys." UCA-1 explained that, "You guys are my eyes and ears," and that they "come already pre-packaged, trained, and you know, you guys both are armed, right?" One of the officers responded, "Right." UCA-1 informed LEE and SCOTT they would be paid, "$1,000.00 each for, you know, fifteen, twenty minutes worth of work." UCA-1 informed MANUEL, LEE, and SCOTT that the narcotics transaction was "two kilos of heroin." LEE then stated that "I don't want to know." LEE further stated that he was just "watching a truck," UCA-1 informed MANUEL, LEE, and SCOTT that they were responsible "if people are coming at these guys." UCA-1 further informed LEE and SCOTT that anyone coming after the individuals in the narcotics transaction were not going to be coming "at these guys with little sticks." UCA-1 instructed LEE and SCOTT to follow the lead of MANUEL and TAYLOR. UCA-1 further stated that as long as TAYLOR and MANUEL have explained to LEE and SCOTT what was going to occur, UCA-1 was fine. UCA-1 told LEE and SCOTT he wanted to make sure they knew "there was something at stake here." LEE responded, "We knew." Both LEE and SCOTT stated that they would make themselves available for the deal or take time off of work. During the conversation, LEE stated that he had worked for the Cook County Courts for five years.

69.     On or about December 10, 2007, UCA-1 had telephonic contact with TAYLOR. UCA-1 informed TAYLOR that the narcotics protection operation planned for that same day was to be at noon in Bolingbrook, Illinois. TAYLOR responded in the affirmative. In a second telephonic conversation with TAYLOR on that same date, TAYLOR informed UCA-1 that his guys [referring to individuals TAYLOR had contacted] were heading to the location. UCA-1 asked

TAYLOR to meet at a restaurant located near Route 53 and Interstate 55 near a Holiday Inn. TAYLOR responded that they were on their way to the location.

70. Shortly thereafter, UCA-1 had a third telephonic conversation with TAYLOR whereby UCA-1 provided directions to a meeting spot, which was a vacant lot, located in Bollingbrook, Illinois. Upon TAYLOR's arrival, UCA-1 and TAYLOR discussed the area where the narcotics transaction was to occur. During this conversation, UCA-1 overheard TAYLOR speaking with MANUEL via Nextel's push-to-talk function, directing MANUEL, SCOTT, and LEE to the meeting location. Shortly thereafter, surveillance Agents observed MANUEL, SCOTT, and LEE arrive at the vacant lot and meet with UCA-1 and TAYLOR. UCA-1 observed SCOTT driving a Chevrolet Suburban bearing an Illinois license plate[23] and LEE driving a vehicle bearing an Illinois license plate.[24] UCA-1 observed SCOTT wearing a Cook County Sheriff's badge bearing number 4749. UCA-1 further observed LEE wearing a Cook County Sheriff's badge bearing number 5219.

71. TAYLOR, MANUEL, LEE, and SCOTT then took position in their vehicles in anticipation of the purported narcotics transaction. Following this, special agents of the FBI, acting in an undercover capacity as narcotics traffickers, were directed by UCA-1 into an office parking lot across the street from the Holiday Inn Hotel located at 205 Remington Boulevard, Bolingbrook, Illinois. The office parking lot was immediately adjacent to the original meeting location. When the undercover agents arrived, the purported narcotics transaction occurred in the parking lot of the office building. During the meeting, the undercover agents exchanged packages of supposed heroin

---

[23]     Per Illinois Secretary of State records, the license plate number observed by agents is registered to JULIUS L. SCOTT, JR., Richton Park, Illinois.

[24]     Per Illinois Secretary of State records, the license plate number observed by agents is registered to DANIEL LEE, Hazel Crest, Illinois.

and United States currency in the parking lot. Surveillance agents observed TAYLOR and MANUEL's vehicles in close proximity to the two undercover agents during the purported narcotics transaction. LEE and SCOTT's vehicles remained moving in the general vicinity. After the meeting occurred, the undercover agents departed from the parking lot.

72.     After the two undercover agents departed, TAYLOR, MANUEL, LEE, and SCOTT met in the original vacant lot, in the immediate vicinity of UCA-1's vehicle. While parked in the vacant lot, the drivers exited the vehicles and met with UCA-1. UCA-1 asked MANUEL the name of the officer known as "DAN." MANUEL responded that his name was, "DAN LEE." UCA-1 asked SCOTT what his (JULIUS's) last name was. SCOTT responded to UCA-1 by stating that his last name was "SCOTT." During UCA-1's meeting with TAYLOR, MANUEL, LEE, and SCOTT, UCA-1 paid TAYLOR and MANUEL $2,000.00 each for their participation in the narcotics protection operation. UCA-1 then provided LEE and SCOTT $1,000.00 each for their participation in the narcotics protection operation. LEE and SCOTT then departed.

73.     After LEE and SCOTT left, UCA-1 discussed with MANUEL and TAYLOR the scheduling of another team for a narcotics protection operation during the following week, before the "holidays," using a "new team," or an "old team." UCA-1 requested that TAYLOR and MANUEL get a new team and then departed from the area.

74.     Suveillance agents obtained photographs and fixed video during the aforementioned narcotics protection operation.

### DECEMBER 17, 2007 PURPORTED NARCOTICS TRANSACTION
### INVOLVING AYHETORO TAYLOR, RAPHAEL MANUEL,
### RICHARD HALL, and ROBERT KELLY

75.     On or about December 11, 2007, UCA-1 met with TAYLOR and MANUEL at a restaurant to discuss future narcotics transactions. During the meeting, UCA-1 asked, "How about getting some squad cars?" TAYLOR replied, "Depending on the area," and "It's possible." MANUEL stated that it was hard to get Sheriff's cars "freelance."[25] TAYLOR informed UCA-1 that he had "access to some that say 'Sheriff' and some that say 'Sheriff Police.'" UCA-1 then asked whether TAYLOR and MANUEL had a team ready for the following week for a possible narcotics transaction. TAYLOR stated that he wanted to use the "first team" of "JERMAINE" and "TAVIS." MANUEL stated that, "I got one dude that could be available, ROB KELLY." MANUEL stated that he would try to meet with KELLY tomorrow. MANUEL suggested teaming up KELLY with "BELL." MANUEL stated that KELLY was one of his childhood friends. TAYLOR stated that, "JERMAINE'S [JERMAINE BELL] been calling since the first one. 'Talk to your boy, you talk to your boy yet, you got another one.' About every week and a half." MANUEL added, BELL has been saying, "Man, let me know, let me know, let me know." MANUEL stated that KELLY was familiar with BUSINESS-1 and that they (MANUEL and KELLY) would meet with UCA-1 at BUSINESS-1.

76.     On or about December 13, 2007, UCA-1 met with MANUEL, "RICH" (later identified to be RICHARD O. HALL, JR.) and "ROB" (later identified to be ROBERT KELLY) at BUSINESS-1. UCA-1 asked HALL and KELLY, "Ray [MANUEL] and Red [TAYLOR] explain

---

[25]     Your Affiant knows the term "freelance" to mean operating out of a normal scope of employment or jurisdiction.

everything to you guys?" Both HALL and KELLY responded, "Yeah." UCA-1 stated, "Every now and then I have a couple of friends that I do a couple of brokering deals for." UCA-1 further stated that he/she hired security guys to make sure everything is a smooth transaction. UCA-1 stated that the "pay scale" was $1,000.00 for one-half hour to hour worth of work. UCA-1 inquired as to whether both HALL and KELLY were from "the County." One of the officers responded, "Yes, sir." UCA-1 asked to see their "buttons" (slang term used to refer to police badges), which HALL and KELLY then showed him. UCA-1 stated "It just going to be two kilos of heroin, just a quick transaction, you guys, none of us have to touch anything." UCA-1 told HALL and KELLY that they are to provide external security. MANUEL then stated that he and TAYLOR were going to get radios for communications. UCA-1 stated, "bring all your gear, ya know just in case." MANUEL stated that the motto with "the county" was, "They pay us for what we might have to do, not for what we do." UCA-1 provided the time for the narcotics transaction to be on Monday, December 17, 2007, between 1:00 p.m. and 2:00 p.m.

77.     On or about December 17, 2007, UCA-1 had a telephone conversation with TAYLOR. During the telephone call, UCA-1 informed TAYLOR to have everyone ready to roll out by 11:15 a.m. or 11:30 a.m. and that he/she was still deciding whether to do Matteson, Illinois, or Tinley Park, Illinois. UCA-1 stated that he/she would call TAYLOR back at approximately 11:10 a.m.

78.     At approximately 11:05 a.m. on December 17, 2007, in a second telephone call to TAYLOR, UCA-1 informed TAYLOR to tell "the guys" the location was Tinley Park, Illinois, and to meet at the Cracker Barrel by noon.

79.     At approximately noon, UCA-1 met with MANUEL, HALL and KELLY at the Cracker Barrel Restaurant located at 18531 North Creek Drive, Tinley Park, Illinois. UCA-1 asked if HALL and KELLY "know what to do." MANUEL stated that he was, "...telling them right now." UCA-1 informed MANUEL, TAYLOR, HALL, and KELLY that the two cars being utilized in the transaction were a white van and a green pickup. According to UCA-1, KELLY was driving a vehicle bearing an Illinois license plate[26] and HALL was driving a vehicle with an Illinois license plate.[27] UCA-1 then sent everyone to their assigned locations.

80.     A few minutes later, surveillance agents observed the above-mentioned vehicles departing the Cracker Barrel and establishing a perimeter in the vicinity of the Holiday Inn located at 18501 South Harlem Avenue, Tinley Park, Illinois. UCA-1 then directed special agents of the FBI, acting in an undercover capacity as narcotics traffickers, into the Holiday Inn parking lot. When the undercover agents arrived, the undercover meeting occurred in the parking lot of the Holiday Inn hotel. During the meeting, the aforementioned special agents exchanged packages of purported heroin and United States currency in the parking lot. After the meeting occurred, the undercover agents departed from the parking lot. Surveillance agents observed UCA-1 pay TAYLOR, MANUEL, HALL, and KELLY for their participation in the purported narcotics transaction. UCA-1 provided TAYLOR and MANUEL $2,000.00 each for their participation in the narcotics protection operation. UCA-1 provided HALL and KELLY $1,000.00 each for their participation in the narcotics

---

[26]     According to Illinois Secretary of State records, the license plate number observed by agents is registered to multiple owners, one of whom is ROBERT L. KELLY, Glenwood, Illinois.

[27]     According to Illinois Secretary of State records, the license plate number observed by agents is registered to RICHARD O. HALL, Chicago, Illinois.

protection operation. UCA-1 asked HALL how he thought it went. HALL stated that it was "smooth."

81. Surveillance agents obtained photographs during the above-described purported narcotics transaction.

### JANUARY 17, 2008 ATTEMPTED NARCOTICS TRANSACTION INVOLVING DWAYNE WILLIAMS, JAMES E. ENGRAM, and ANTOINE DUDLEY

82. The following section describes a series of conversations and events involving UCA-1, DWAYNE WILLIAMS, JAMES ENGRAM, and ANTOINE DUDLEY in which UCA-1 planned a purported narcotics transaction for January 17, 2008. This transaction never occurred and was eventually cancelled by UCA-1.

83. On or about January 4, 2008, during an unrecorded meeting, DWAYNE WILLIAMS personally introduced UCA-1 to Harvey Police Officer JAMES E. ENGRAM, JR. while at BUSINESS-1.[28] WILLIAMS stated that ENGRAM could be fully trusted with any extra work available. UCA-1 asked ENGRAM if he was up for side work, to which ENGRAM replied that he was.

84. On or about January 5, 2008, UCA-1 met with DWAYNE WILLIAMS at BUSINESS-1. UCA-1 asked WILLIAMS if he was, "up for a little project, same as last time, same as before?" WILLIAMS indicated that he was.

85. On or about January 8, 2008, UCA-1 telephonically contacted JAMES E. ENGRAM, JR. UCA-1 told ENGRAM he/she had something coming up and wanted to know if ENGRAM was

---

[28] UCA-1 later identified ENGRAM via an Illinois Secretary of State driver's license photograph as the individual WILLIAMS introduced to UCA-1 on January 4, 2008, while inside BUSINESS-1.

interested in some side work. ENGRAM stated, "OK, when?" UCA-1 informed ENGRAM of the date and stated that ENGRAM would be paid $1,000.00 for approximately one hour of work. UCA-1 asked ENGRAM if DWAYNE WILLIAMS had told him (ENGRAM) about UCA-1's, "...special, specific needs as far as security matters." ENGRAM responded, "Yes." UCA-1 further asked ENGRAM if WILLIAMS explained how everything operated. ENGRAM again responded, "Yes." ENGRAM informed UCA-1 that his schedule for the date requested was fine since he would be out of class between 2:30 p.m. and 3:00 p.m. and would be free after that time. UCA-1 asked ENGRAM if he had his weapon assigned. ENGRAM stated, "Yes." UCA-1 stated, "Make sure you bring that along." ENGRAM concluded the conversation with UCA-1 by stating, "O.K., just give me a call."

86.     On or about Tuesday, January 8, 2008, UCA-1 had telephonic contact with ANTOINE DUDLEY. UCA-1 inquired as to DUDLEY's schedule on Thursday (January 10, 2008). DUDLEY stated that he worked, but if UCA-1 needed him that he could take the day off. UCA-1 stated he/she had something "cooking" for Thursday, it would be the same as last time, just a little bit more, and UCA-1 was offering $1,000.00 for about an hour's worth of work. DUDLEY asked, "For a stack? For a thousand dollars?" UCA-1 said, "Yes sir." DUDLEY continued by stating, "Okay, I'll do that then." DUDLEY stated that he would try to call his commander to take the day off and also contact DWAYNE WILLIAMS.

87.     On or about Tuesday, January 8, 2008, UCA-1 had telephonic contact with DWAYNE WILLIAMS. WILLIAMS stated that they had him training one of the rookies and that he (WILLIAMS) was in the station. UCA-1 asked WILLIAMS if Thursday (January 10, 2008) between 4:00 p.m. and 5:00 p.m. was good. WILLIAMS stated, "Good." UCA-1 informed WILLIAMS that it was the same deal as last time, but he/she was increasing the amount and also

increasing the pay to $1,000.00 per head. UCA-1 stated that DUDLEY and ENGRAM were in for Thursday. WILLIAMS stated that he would swing through BUSINESS-1 around 11:30 p.m. when he got off work.

88.     On or about Wednesday, January 9, 2008, UCA-1 had telephonic contact with WILLIAMS. WILLIAMS stated that he tried to get to BUSINESS-1 last night, but he was doing F.T.O. (I know this to term to be used in law enforcement for Field Training Officer) and his trainee couldn't get his reports right until about 1:30 a.m. UCA-1 informed WILLIAMS that he/she would like to have a four-person team. WILLIAMS stated that if it was the same as last time and at the same location, three people could cover it. UCA-1 informed WILLIAMS that he/she had three other locations that he/she had been using.

89.     On or about January 9, 2008, UCA-1 had telephonic contact with DUDLEY. DUDLEY informed UCA-1 that he was good and had taken the next day off. UCA-1 asked DUDLEY if he had a fourth person that DUDLEY could get and that DUDLEY trusted. DUDLEY stated that he could get a fourth person that he trusted. UCA-1 stated to DUDLEY, "Make sure he's packing and he's got a badge and everything so you guys know what you have to do if anything goes down." DUDLEY stated that he was going to call a guy as soon as he got off of the phone with UCA-1 to see what his schedule was like. UCA-1 asked DUDLEY to bring the person by BUSINESS-1 that evening and to tell the person if he could take the day off, it would be worth his while. In a second telephone call on the same day with DUDLEY, DUDLEY stated that he left a message with his other guy and was waiting for him to call back. UCA-1 stated that his buyer was out-of-pocket until Monday (January 14, 2008) and asked what DUDLEY's schedule was like for

next week. DUDLEY stated that he was off on Monday and Tuesday (January 14 & 15, 2008). UCA-1 stated that tomorrow was off and it would be Monday around the same time.

90.     On or about January 9, 2008, UCA-1 had telephonic contact with DWAYNE WILLIAMS. UCA-1 informed WILLIAMS that his/her buyer was out-of-pocket until Monday afternoon. WILLIAMS stated that he was training and an F.T.O. Monday and would not be able to get time off of work. UCA-1 and WILLIAMS stated that they would talk at BUSINESS-1 later that evening.

91.     On or about January 9, 2008, UCA-1 had telephonic contact with ENGRAM. UCA-1 stated that there were not enough bodies for tomorrow and that things would be delayed one week.

92.     On or about January 10, 2008, UCA-1 met WILLIAMS at BUSINESS-1. UCA-1 discussed his/her request for a four- person team. WILLIAMS told UCA-1 that his belief was the transaction could be covered by three people. UCA-1 informed WILLIAMS that the quantity had increased from the last time he helped UCA-1. UCA-1 stated that, "Last time, I don't remember what the quantity was, cause it's been, it's been a couple of months, but now, I mean, we've upped it. I mean about thirty kilos of cocaine and stuff, and typically a couple kilos of heroin. So we're talking about a good chunk of change." Based on the quantities, UCA-1 stated that he/she wanted to be "manned up." UCA-1 stated that if they could be "geared up" and come with all their "goodies," it would be good. UCA-1 asked WILLIAMS if ENGRAM was cool with everything. WILLIAMS stated that ENGRAM was, "...cool with everything." WILLIAMS told UCA-1 that he would team up with ENGRAM since WILLIAMS, "trusted him enough." WILLIAMS stated that they, "...grew up on the streets together, if something were to jump off he knows what to do." WILLIAMS stated that "if something did jump off, I'd probably be the one that pretty much handle..take the lead...as

far as the legal aspect, I feel more comfortable with me doing it, me being, ya know, me being the mouthpiece." UCA-1 informed WILLIAMS that the pay was $1,000.00 each.

93.     On or about January 10, 2008, UCA-1 had telephonic contact with DUDLEY. DUDLEY said his guy could not do it on Monday (January 14, 2008) due to his schedule. UCA-1 asked DUDLEY how next Thursday (January 17, 2008) looked for him and his guy. DUDLEY stated that he would check his schedule and check with that individual. UCA-1 asked DUDLEY to bring that individual over to BUSINESS-1 at sometime so UCA-1 could meet him and to fill-in both DUDLEY and that individual about the details.

94.     On or about January 14, 2008, UCA-1 had telephonic contact with DUDLEY. DUDLEY informed UCA-1 that the individual they had previously discussed was out for Thursday. UCA-1 stated that he/she would have to go with another team. DUDLEY stated that he had another guy that he was going to ask and would contact UCA-1 in an hour to let him/her know.

95.     On or about January 15, 2008, UCA-1 had telephonic contact with DUDLEY. DUDLEY stated that, "It ain't looking good." UCA-1 asked DUDLEY if his buddy backed out because he could make it or if he got cold feet and was freaked out. DUDLEY stated that it was because, "He couldn't make it." UCA-1 asked, "Alright, but he wasn't freaked out or anything right? He's not, that's not going to be an issue?" DUDLEY responded, "No, no."

96.     On or about January 15, 2008, UCA-1 left a voicemail message on WILLIAMS' telephone. UCA-1 informed WILLIAMS that there was a manpower issue for Thursday and to give ENGRAM a call to cancel. Later that same day, UCA-1 placed a second telephone call to WILLIAMS. UCA-1 stated that DUDLEY and his buddy could not make it, creating a manpower

issue. UCA-1 further stated that he/she was going with "Plan B." UCA-1 asked WILLIAMS to call ENGRAM and let him know that it was off.

## FEBRUARY 29, 2008 PURPORTED NARCOTICS TRANSACTION INVOLVING DWAYNE WILLIAMS, JAMES ENGRAM, and ANTOINE DUDLEY

97.     The following section describes a series of conversations between UCA-1 and DWAYNE WILLIAMS, JAMES ENGRAM, and ANTOINE DUDLEY, in which a purported narcotics transaction was initially planned for February 19, 2008. Due to operational reasons, this purported narcotics transaction never occurred. However, following February 19, 2008, UCA-1 then had additional conversations with these individuals, and a purported narcotics transaction occurred on February 29, 2008, involving WILLIAMS, ENGRAM and DUDLEY.

98.     On February 15, 2008, UCA-1 met with WILLIAMS and ENGRAM at BUSINESS-1. UCA-1 asked if both WILLIAMS and ENGRAM were available to help UCA-1 the following week. Both WILLIAMS and ENGRAM responded that they were available the following week. WILLIAMS then departed, and UCA-1 continued to speak directly to ENGRAM. UCA-1 informed ENGRAM that he (UCA-1) "broker[s] some deals between some friends" from Detroit, St. Louis, and Texas. UCA-1 further advised ENGRAM that he sets up the meetings, and then "provide[s] security." UCA-1 then stated that one guy comes with "money" and another guy comes with "a couple bags of just low quantity, ya know stuff, sometimes just weed, cocaine." ENGRAM responded by saying, "I don't need to know what's in the bags." During this conversation, ENGRAM told UCA-1 that he and DWAYNE WILLIAMS go back 25 years, and if DWAYNE WILLIAMS is "comfortable with this shit here, you got me."

99.     ENGRAM continued telling UCA-1 about his own background and prior involvement in criminal conduct. ENGRAM stated, "I ain't always been in law enforcement, DWAYNE will tell you. I sold a lot of weight at a young age, I just never got caught. So I know about other dealers watching. I use my street knowledge as well as what they taught me on the force to watch and learn body language, cars, and we can do things on an as to know basis."[29]

100.    UCA-1 told ENGRAM that in the future UCA-1 would say "TV" when he was discussing cocaine, and would say "vacuums" when he was talking about marijuana. ENGRAM agreed with this terminology. UCA-1 then stated that next week they needed to deliver a "couple of TV's."

101.    On February 19, 2008, UCA-1 telephonically contacted DUDLEY and advised DUDLEY that "JAMES [ENGRAM] and DWAYNE [WILLIAMS]" were helping UCA-1 tomorrow "same as before." DUDLEY responded, "Ya, I'm good." UCA-1 then gave DUDLEY information on the approximate time and stated DUDLEY should "bring all your gear."

102.    Due to operational reasons, however, later on February 19, 2008, UCA-1 spoke to both DUDLEY and WILLIAMS and advised them that the purported narcotics transaction scheduled for that day was not going to go forward.

103.    Following this conversation, between February 25, 2008 and February 29, 2008, UCA-1 had numerous conversations with ENGRAM, DUDLEY, and WILLIAMS in which they discussed a purported narcotics transaction that UCA-1 had now planned for February 29, 2008.

---

[29]     Based on my training and experience, your affiant is aware that "a lot of weight" as used in this context means large quantities of illicit drugs.

104. During a conversation on February 28, 2009 with JAMES ENGRAM, UCA-1 advised ENGRAM that the purported narcotics transaction would be on February 29, 2008, between approximately 1:00 p.m. and 3:00 p.m. UCA-1 further advised that "two guys" would be there to make the "exchange." UCA-1 explained that the security team would consist of "two guys on point," and a third guy "in the vicinity just cruisin' around making sure the outskirts of where we are is clear." UCA-1 further said "one guy is going to have a bag of money," and one guy "is going to have a bag of TV's [a term UCA-1 and ENGRAM had previously agreed would mean cocaine]." UCA-1 continued by saying, as soon as they make the "exchange," they "roll out," jump on the highway, and we "skedaddle." UCA-1 informed ENGRAM that UCA-1 was going to pay ENGRAM, DUDLEY, and WILLIAMS each $1,000. ENGRAM responded, "Okay."

105. On February 29, 2008, UCA-1 telephonically contacted DUDLEY, ENGRAM, and WILLIAMS to advise them of the meeting location for the purported narcotics transaction. Following these conversations, UCA-1 met with WILLIAMS at a Cracker Barrel restaurant, where UCA-1 discussed the logistics and planning of the upcoming purported narcotics transaction. During this meeting, UCA-1 advised WILLIAMS that the location to be utilized was "across the street. There's a convention center, Holiday Inn."

106. Following the above-described meeting at the restaurant, UCA-1 followed WILLIAMS to WILLIAMS' vehicle. While in WILLIAMS' vehicle, UCA-1 observed a bulletproof vest in the back seat of WILLIAMS' vehicle. WILLIAMS and UCA-1 then had a brief discussion regarding the bulletproof vest.

107. UCA-1 then met with WILLIAMS and ENGRAM and discussed the planning and location of purported narcotics transaction. During this meeting, UCA-1 told WILLIAMS and

ENGRAM (as UCA-1 had previously told ENGRAM) that UCA-1 would use the term "TV" to mean "cocaine," and that when UCA-1 used the term ""shop vacuums" or "vacuum cleaner," UCA-1 meant "heroin."[30] UCA-1 then told WILLIAMS and ENGRAM that "last time you helped me out it was only five, five TV's" and "this time it's twenty-five, so just keep a sharp eye."

108. In UCA-1's presence, WILLIAMS informed ENGRAM: "James, you up there towards the front of the parking lot what you looking for is pretty much any vehicles that come in with two or more people in it and definitely any multiple vehicles coming there moving too fast."

109. Following this exchange, ANTOINE DUDLEY arrived at the location. DUDLEY asked, "Am I going to need my gun?" UCA-1 stated, "Keep it on you just in case. Have your badge and your gun just in case." WILLIAMS then proceeded to have a conversation with DUDLEY and ENGRAM about the planning of the purported narcotics operation. During this conversation, WILLIAMS then inquired if the location for the purported narcotics operation had surveillance cameras. UCA-1 then again informed WILLIAMS, DUDLEY and ENGRAM that, "Last time you guys helped me out, like I told these guys, it was five. This time it's going to be twenty-five." UCA-1 then explained to WILLIAMS, DUDLEY, and ENGRAM that he/she was going to utilize code words to describe the quantity of narcotics being brokered. UCA-1 stated, "From now on when I say TV's it's a kilo of coke."

110. Following this conversation, WILLIAMS, DUDLEY and ENGRAM then left the meeting and moved to various locations to provide security for the purported narcotics transaction.

---

[30]     UCA-1 in a previous conversation with ENGRAM had said that "vacuum" meant marijuana.

UCA-1 then received an incoming phone call from WILLIAMS, who advised UCA-1 where the vehicles involved in providing security would be parked.

111.    A few minutes later, UCA-1 observed WILLIAMS, DUDLEY, and ENGRAM each enter their vehicle and depart the Cracker Barrel parking lot. Surveillance agents obtained license plate information from the three vehicles which established a perimeter in the vicinity of the Holiday Inn located at 18501 South Harlem Avenue, Tinley Park, Illinois. UCA-1 then directed special agents of the FBI, acting in an undercover capacity as narcotics traffickers, into the Holiday Inn parking lot. When the undercover agents arrived, the undercover meeting occurred in the parking lot of the Holiday Inn hotel. During the meeting, the aforementioned Special Agents exchanged packages of supposed cocaine and United States currency in the parking lot. After the meeting occurred, the undercover agents departed from the parking lot. WILLIAMS stated to UCA-1 that he (WILLIAMS) had spoken to "JIMMY" [ENGRAM] and told ENGRAM to, "make sure that they (narcotics traffickers) got outta there okay." Surveillance agents observed UCA-1 pay WILLIAMS, DUDLEY, and ENGRAM for their participation in the purported narcotics transaction. UCA-1 provided WILLIAMS and ENGRAM $1,000.00 each for their participation in the narcotics protection operation. UCA-1 provided DUDLEY with $1,200.00 for his participation in the narcotics protection operation.

112.    During the course of the purported narcotics transaction, UCA-1 observed the three vehicles being driven by WILLIAMS, DUDLEY and ENGRAM. These vehicles were as follows: DUDLEY was driving a Buick, with an Illinois license plate, which plate was registered to ANTOINE D. DUDLEY, Harvey, Illinois; WILLIAMS was driving a Chevrolet Jimmy SUV, with an Illinois license plate, which plate was registered to DWAYNE WILLIAMS, Illinois; and

ENGRAM was driving a Toyota Camry, with an Illinois license plate, which plate was registered to JAMES ENGRAM, JR. Additionally, UCA-1 observed WILLIAMS, DUDLEY and ENGRAM all carrying weapons during the course of the purported narcotics transaction. When UCA-1 provided WILLIAMS, DUDLEY, and ENGRAM with their payments, UCA-1 observed WILLIAMS wearing a Harvey Police Department badge and a black semi-automatic pistol. UCA-1 also asked DUDLEY and ENGRAM if they were carrying weapons. UCA-1 stated that DUDLEY and ENGRAM responded affirmatively. Upon your affiant's review of the audio recording, when UCA-1 asked the type of weapons they were carrying, one made a comment about a Ruger, one individual commented about carrying a Smith & Wesson MP, and one individual indicated that they had "just put my shit up." Your affiant understands this comment to mean that the individual had just placed his weapon in his vehicle prior to meeting with UCA-1 for payment. Based on your affiant's review of the audio recording, I could not currently identify the individuals' voices due to multiple voices overlapping.

113.     During the course of the above described purported narcotics transaction, agents obtained video surveillance and photographs of WILLIAMS, ENGRAM and DUDLEY at various points during the transaction.

### APRIL 18, 2008 SALE OF COCAINE TO UCA-1 INVOLVING AHYETORO TAYLOR and RAPHAEL MANUEL

114.     On April 17, 2008, UCA-1 telephonically contacted AHYETORO TAYLOR and asked TAYLOR if TAYLOR could get "one and one, one soft and one hard." Based on my training and experience, I understand this term to mean one ounce of powder cocaine and one ounce of crack cocaine. TAYLOR responded by stating, "That ain't no problem. I'll let RAPH [RAPHAEL

MANUEL] know today because he talks to him more than I do." UCA-1 asked whether the supplier was the same supplier and requested that TAYLOR "make it better stuff this time" than UCA-1 had previously received (referring to the December 5, 2007 drug purchase). UCA-1 advised TAYLOR that he /she needed, "this stuff [referring to the requested cocaine] for tomorrow." TAYLOR responded by saying, "No problem."

115.    On April 18, 2008, UCA-1 telephonically contacted TAYLOR and asked if TAYLOR was going to get the cocaine for UCA-1 and what the price would be. Approximately three minutes later, UCA-1 received a phone call from TAYLOR, who said, "Hey what's up brother. He said eight a piece." Your affiant understands this to mean $800 per ounce of cocaine.

116.    Following the above telephone conversation with TAYLOR, UCA-1 then called MANUEL, who told UCA-1 that he (MANUEL) would come grab the money in forty- five minutes. MANUEL then asked UCA-1 what time he / she needed "it" by. MANUEL then asked, "Three or four?" UCA-1 responded by saying he / she would need the drugs by noon. Following this conversation, there were a series of phone calls and voicemail messages between UCA-1 and MANUEL regarding the time frame.

117.    Following the phone conversation described immediately above, UCA-1 met with MANUEL at the undercover residence. This meeting was recorded by both video and audio recording equipment. UCA-1 paid MANUEL $1,600 in prerecorded United States currency to purchase the cocaine. UCA-1 then paid MANUEL an additional $100 for delivering the cocaine to the undercover residence. UCA-1 asked MANUEL how far MANUEL had to go, and MANUEL responded that he had to go to an address in Chicago, and the turnaround time would be about 30 to 45 minutes

118.    At approximately 11:01 a.m., UCA-1 telephonically contacted MANUEL. MANUEL stated, "I am getting it right now. I will call you back in like ten minutes when I am on my way back to you." MANUEL further stated, "They on [sic] their way back right now." At approximately 11:49 a.m., MANUEL called UCA-1 and informed UCA-1 that he (MANUEL) was downstairs (outside) from UCA-1's residence.

119.    MANUEL and UCA-1 then entered the undercover residence. MANUEL provided UCA-1 with two clear plastic baggies containing what appeared to be cocaine. In MANUEL's presence, UCA-1 weighed each baggy and noted that each baggy weighed "one [ounce] and one [ounce]." Subsequent testing by the U.S. Department of Justice, Drug Enforcement Administration (DEA), North Central Laboratory (SFL5), Chicago, Illinois, determined that the substances delivered by MANUEL were cocaine hydrochloride with a net weight of 56.2 grams and a purity level of 58.7 percent.[31]

120.    On this same date, surveillance agents observed a vehicle matching the description of MANUEL's parked outside of the undercover residence. Additionally, at that time, UCA-1 contacted a surveillance agent and notified them that MANUEL was outside of the undercover residence. Agents observed MANUEL exit the vehicle and proceed to enter the residential complex. MANUEL was observed by surveillance agents entering the undercover residence and being provided with United States currency by UCA-1. Agents then observed MANUEL depart the residence and proceed to a residence in Chicago, Illinois. MANUEL was observed being greeted by a male from the residence. The aforementioned male departed the area driving MANUEL'S

---

[31]    Although UCA-1 discussed purchasing one ounce of powder cocaine, and one ounce of "crack" cocaine, MANUEL delivered two ounces of powder cocaine to UCA-1.

vehicle. MANUEL remained on the front porch of the residence during this time. Approximately twenty minutes later, the male returned in MANUEL'S vehicle. Upon return, MANUEL and the male entered the residence. While inside the residence, surveillance agents observed the license plate of MANUEL's parked vehicle, which according to Illinois Secretary of State records is registered to RAPHAEL MANUEL, Glenwood, Illinois. MANUEL then departed and proceeded in this vehicle to the undercover residence. MANUEL was then observed by surveillance agents entering the undercover residence.

## MAY 13, 2008 PURPORTED NARCOTICS TRANSACTION INVOLVING AHYETORO TAYLOR and RAPHAEL MANUEL

121. The following events describe a purported narcotics transaction that eventually occurred on May 13, 2008. Due to a number of operational issues, the purported transaction was delayed several times. The initial conversations regarding the transaction began January 18, 2008. On January 18, 2008 in a telephone conversation, UCA-1 informed TAYLOR and MANUEL that he / she "got a little something for" them. UCA-1 said he /she had a "small plane," and they would meet a small plane, make sure "our guy gets to it" and then "caravan, escort him down to Indiana." UCA-1 then asked, "Can we come up with a new team for something different like that? How we doing?" TAYLOR stated, "You need more than two people?" UCA-1 responded, "I'd like to stick with four." During this conversation, TAYLOR informed UCA-1 that they lost "J." TAYLOR continued by describing "J" as a dark skinned black male who drove a black car. TAYLOR then referred to "J" as "JERMAINE," and further described "J" as being involved in, "the one we did with TAVIS (TAVIS RAMSEY) out in Tinley Park." Based on TAYLOR's statements, your affiant believes TAYLOR is referring to JERMAINE BELL. Your affiant is aware BELL participated in

the purported narcotics transaction of September 14, 2007, but later declined to participate in a future purported narcotics transaction in 2008. TAYLOR stated that, "He (BELL) said he wouldn't give a shit what we was doing, as long as, you ain't tellin' em." TAYLOR then made reference to having "plausible deniability" because others involved do not know about the "in and outs of the law." UCA-1 then discussed with TAYLOR and MANUEL using an airplane at a small airport. TAYLOR inquired, "Like Lansing?" Your affiant understands this to mean a reference to a small airport located at Lansing, IL. TAYLOR further inquired, "So we can let the people know, what's the take on this one?" UCA-1 then informed both TAYLOR and MANUEL that it would be the "same, keep it the same" as last time.

122.    On February 9, 2008, UCA-1 met with MANUEL at BUSINESS-1. During this meeting, UCA-1 informed MANUEL that he / she had obtained a "bigger plane and he's going to for the time being he's going to fly directly to Detroit." UCA-1 then told MANUEL that we (UCA-1, MANUEL and TAYLOR) might have to drive to Detroit to help out. MANUEL responded that it would be "no problem," and that a recent law had been passed enabling us to "carry in all fifty states." UCA-1 told MANUEL that he / she wanted "to fly the stuff in here and then just transport it to Indiana." UCA-1 further told MANUEL that "we got a couple small airports where ya know they don't check shit."

123.    On or about April 2, 2008, UCA-1 met with TAYLOR and MANUEL at the undercover residence. UCA-1 discussed future plans to utilize an airplane to transport narcotics into the Chicago, Illinois, area. UCA-1 then informed TAYLOR that he/she would put some "stuff" in his rental car and take the car to a WalMart, "When my guy shows up from St. Louis" UCA-1 would then direct the "guy" to his/her car. UCA-1 then stated that the "guy" would "grab the stuff, take off

and then we're out of here." TAYLOR then asked if the airport was "the airport in Lansing?" UCA-1 stated, "The guy, he definitely wants thirty, thirty kilos of powder, but I'm trying to get him to consolidate so I don't have to do it over and over..." UCA-1 then stated, "How's four grand each sound?" TAYLOR replied, "Four grand each?" UCA-1 asked, "That cool?" TAYLOR replied, "That cool."

124. Later during the conversation, UCA-1 stated that when his/her "high roller buddies show up are you going to be able to take care of them again with that stuff?" TAYLOR stated, "Oh yeah." MANUEL replied, "Um, hum." MANUEL stated, "How was it last time, they were, they were satisfied...?" UCA-1 stated, "They thought it was gonna be, gonna be uncooked or cooked...?" TAYLOR replied, "How do you want it?" MANUEL stated, "See I got it, I got it raw because it was the best the best deal and so that I mean it was pretty good, so I didn't, I didn't tell the (sic) to do anything to it." TAYLOR then stated, "How do they want it? Do they want it cooked up?" This portion of the conversation refers to the December 5, 2007, delivery of one ounce of cocaine to UCA-1 by MANUEL, as described above.

125. On or about April 10, 2008, TAYLOR met with UCA-1 at the undercover residence. UCA-1 had previously received a list via e-mail from TAYLOR. The list contained names or identifiers of individuals that had previously participated in the narcotics protection operations. UCA-1 and TAYLOR discussed the names contained on the list and TAYLOR provided additional details about their participation in previous narcotics protection operations as well as their occupations. UCA-1 then asked TAYLOR about purchasing cocaine from him (which was previously discussed with TAYLOR and MANUEL on April 2, 2008). UCA-1 stated, "I may need

one and one, you know an ounce of hard and ounce of soft." UCA-1 asked TAYLOR how much advanced notice he would need to obtain the cocaine. TAYLOR responded, "About a day."

126. On or about April 30, 2008, TAYLOR asked UCA-1 if "We're still in the holding status though right?" UCA-1 stated, "The guy came up with the money for thirty, but he's got to come up with fifty, for fifty cause all otherwise it's not even worth bring the plane down."

127. On or about May 10, 2008, UCA-1 telephonically contacted TAYLOR. UCA-1 informed TAYLOR that "we're on, we're on for Tuesday [referring to May 13, 2008] so clear your morning." UCA-1 told TAYLOR to call MANUEL to arrange a meeting to "rebrief on Tuesday." Following that conversation, TAYLOR telephonically contacted UCA-1 and stated that he and MANUEL would meet UCA-1 at the Applebee's located at approximately 78th and Cicero around 1:15 p.m. that day.

128. On that same day, UCA-1 met with TAYLOR and MANUEL at the Applebee's located at 7601 South Cicero Avenue, Chicago, Illinois, as noted above. UCA-1 met with TAYLOR and MANUEL inside TAYLOR's vehicle, which was parked in the Applebee's parking lot. UCA-1 informed them that they "were on for Tuesday, Tuesday morning." UCA-1 explained that he / she would have someone rent a car for him / her (UCA-1). UCA-1 further explained that nothing would go inside their vehicles because they would load UCA-1's vehicle and TAYLOR and MANUEL would follow UCA-1. Then, they would go to a second location where UCA-1 would park the vehicle, and then enter TAYLOR and MANUEL's vehicle. UCA-1 stated that, "When the guy comes in," UCA-1 would "remote open the trunk." UCA-1 further stated that "He'll grab the stuff and take off." Then, UCA-1 would get back in his car and then they could take off.

129. During this same conversation, UCA-1 told TAYLOR and MANUEL that he / she could get their guy a "minimum ten." Based on previous conversations between UCA-1, TAYLOR and MANUEL, your affiant understands this to be a reference to ten kilograms of cocaine. UCA-1 continued that he could "do five, but no less than five. But I can get 'em for 16 ($16,000) or 18 ($18,000) depending on how it comes in, and it's, it's gonna be like 99% (purity level). So I mean that, that shit's going on, going for around 26 ($26,000) right now." MANUEL responded, "24 ($24,000) right, 24 ($24,000), 26 ($26,000)." UCA-1 stated, "24 ($24,000), 26 ($26,000) [per kilogram] so it's all profit and we will go fifty-fifty." Your affiant understands this to be a reference to allocating the profit 50% to UCA-1 and 50% to MANUEL/TAYLOR." UCA-1 then told MANUEL and TAYLOR to find out if "he's [MANUEL and TAYLOR's narcotics purchaser] good for it" (10 kilograms of cocaine) because UCA-1's source would throw in an "extra ten" (10 kilograms of cocaine) for UCA-1.

130. On May 13, 2008 at approximately 8:39 a.m., UCA-1 telephonically contacted TAYLOR, and provided TAYLOR with directions and a meeting time at a location near DuPage Airport. UCA-1 received a follow-up telephone call from TAYLOR, and UCA-1 provided further details and directions to the location of the meeting.

131. Following the above telephone calls, UCA-1, TAYLOR and MANUEL then met at a Harris Bank located at 3890 East Main Street, St. Charles, Illinois. UCA-1 told TAYLOR and MANUEL that he / she had told "him" (the courier) to wait in the St. Charles area. TAYLOR told UCA-1 that he (TAYLOR) had brought two-way walkie-talkies, and handed one to UCA-1. UCA-1 then told TAYLOR and MANUEL that it was going to be "eighty." Based on previous conversation, your affiant understand this to mean 80 kilograms. UCA-1 further explained that the delivery would

probably be in "two bags." Together UCA-1, TAYLOR and MANUEL then waited for the arrival of an airplane. After a period of time, UCA-1 stated, "I think that's them. That's gotta be them. I think that's it. Its about fucking time. . . . See the one with the propellers, that's it." TAYLOR then stated that he observed two guys walking, and that he (TAYLOR) noticed an individual behind UCA-1.

132.    After the undercover aircraft arrived, UCA-2, a Special Agent of the FBI, departed the aircraft[32] and met with UCA-1 in the lobby of the DuPage Airport. UCA-2 then escorted UCA-1, MANUEL and TAYLOR (who had joined UCA-1 and UCA-2) aboard the aircraft, which was observed by surveillance agents. The aircraft utilized on May 13, 2008, was a small twin propeller engine, six-passenger aircraft.

133.    Once inside the aircraft, UCA-3, also an undercover agent of the FBI, told UCA-1 that "everything's here." UCA-3 then instructed UCA-1 to check the numbers because "it's not coming back on me if it's short." UCA-3 stated that there were four bags. UCA-1 then instructed TAYLOR to give "me a count RED. Do a real quick count." TAYLOR asked if "there's three bags?" UCA-2 informed TAYLOR that there were four bags. UCA-1 then stated that he/she had, "fifteen in this one...thirty right here." After additional conversation, MANUEL stated that there were "25 in each bag."

134.    Surveillance agents observed UCA-1, UCA-2, TAYLOR and MANUEL then exit the aircraft. UCA-1, UCA-2, TAYLOR, and MANUEL each carried a bag which contained what was purported to be packaged kilograms of cocaine. The foursome then returned to the lobby of the DuPage Airport. At that time, UCA-2 remained inside the DuPage Airport, while UCA-1,

---

[32]    The aircraft was an aircraft under the control of the FBI.

TAYLOR, and MANUEL were observed carrying four bags to the parking lot of the DuPage Airport. Surveillance agents observed UCA-1 carry two bags, while TAYLOR and MANUEL each carried one bag containing the purported packaged kilograms of cocaine. Surveillance agents then observed the threesome loading the four bags into UCA-1's undercover vehicle. Surveillance agents then observed UCA-1 depart the parking lot of the DuPage Airport, followed by TAYLOR and MANUEL who were driving in a separate vehicle.

135. UCA-1 then proceeded to a parking lot of a retail store near the DuPage Airport, followed by TAYLOR and MANUEL. UCA-1 exited the undercover vehicle, and entered the vehicle being driven by TAYLOR and MANUEL. TAYLOR then commented that UCA-1 parked "way out in the open." MANUEL asked UCA-1, "What is he in? What is he in?" UCA-1 stated, "Mercedes." Your affiant believes this to be a reference to the type of vehicle in which the individual picking up the cocaine was driving. A short time later, a Mercedes arrived in the parking lot and parked next to UCA-1's undercover vehicle. The Mercedes was being driven by another undercover FBI agent. The trunks of both UCA-1's vehicle and the Mercedes were opened, and the undercover FBI agent proceeded to remove the four bags from UCA-1's vehicle and place the bags inside the trunk of the Mercedes. The Mercedes, driven by the undercover agent, then drove away from the area.

136. UCA-1 then paid TAYLOR $2,500 in USC. UCA-1 had previously paid TAYLOR $1,500 as an advance. UCA-1 also paid MANUEL with $4,000 in USC.

## CONCLUSION

137.     Based on the foregoing information, I believe there is probable cause to charge the above named defendants with conspiracy to possess with the intent to distribute a controlled substance, namely amounts of cocaine and/or heroin as identified in the face sheet of the complaint, in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

Supervisory Special Agent James P. Roache
Federal Bureau of Investigation

Date: _____

Subscribed and sworn before me this
1st day of December 2008.

Honorable Michael T. Mason
United States Magistrate Judge
Northern District of Illinois

Page 61 of 61